CONCURRING: WILLIAM F. GARBARINO, Presiding Judge and JON W. THOMPSON, Judge.

60 P.3d 246

STATE of Arizona, ex. rel. Janet NAPOLITANO, Plaintiff–Appellee,

Mona Garofalo, Laura Garofalo, Karen Garofalo, Catherine Colluci, Dawn De-Batt, Michelle DeBatt, and Shirley Shiffren, Intervenors–Appellees,

v.

Salvatore GRAVANO, aka Jimmy Moran, Defendant–Appellant.

1207 E. Secretariat Drive, Tempe, et al., Defendants–Appellants In Rem.

No. 1 CA–CV 02–0025.

Court of Appeals of Arizona, Division 1, Department B.

Dec. 24, 2002.

Review Denied June 30, 2003.

Janet A. Napolitano, Arizona Attorney General, by Cameron H. Holmes, Assistant Attorney General, Phoenix, Attorneys for Plaintiff–Appellee.

Osborn Maledon, P.A., by Larry A. Hammond, John A. Stookey and Maureen Beyers, Phoenix, Attorneys for Defendant–Appellant.

WINTHROP, Judge.

¶ 1 In this appeal, we consider whether the application of Arizona's forfeiture statutes to royalties from a book about the life and crimes of a convicted racketeer violates constitutional free speech guarantees. We further examine whether the royalties have the causal connection with racketeering required for forfeiture. For the reasons discussed below, we conclude that the statutes are constitutional in this setting and that the royalties are subject to forfeiture as proceeds traceable to racketeering. As a result, we affirm the trial court's judgment ordering forfeiture of the royalties.

## FACTUAL AND PROCEDURAL BACKGROUND

¶ 2 On February 24, 2000, appellant Salvatore Gravano, aka "Sammy the Bull," aka Jimmy Moran ("Gravano"), and others were arrested and charged in Maricopa County with state crimes related to the alleged distribution of MDMA, a dangerous drug with the street name of "Ecstasy." Gravano was no stranger to the criminal justice system; in 1991, he pled guilty in federal court in New York to one count of violating the federal Racketeer Influenced and Corrupt Organizations Act ("RICO"). See 18 U.S.C. § 1962. Gravano's conviction arose from his participation in the Gambino organized crime family, in which he was involved in racketeering activity, including murder and extortion. As a result of his plea agreement, under which he cooperated with law enforcement in the prosecution of others involved in organized crime, Gravano was sentenced to five years in prison and placed in the federal witness protection program.

¶ 3 Two months after Gravano's arrest in Arizona, the State of Arizona filed a Notice of Pending Forfeiture and Notice of Seizure for Forfeiture relating to property owned by Gravano and the others charged with Ecstasy distribution. Included in items owned by Gravano and subject to forfeiture were money, guns, jewelry, cellular phones, and a vehicle. The State also sought forfeiture of all rights of Gravano "to payment, royalties, receipt of the beneficial interest of any trust, and receipt of any benefit by any means present or future" in connection with the preparation, publication, or promotion of the non-fiction work about Gravano's life that was written by Peter Maas, published by Harper Collins (UK), Inc., in 1997, and entitled *Underboss: Sammy the Bull Gravano's Story of Life in the Mafia ("Underboss")*.

¶ 4 On June 23, 2000, the State filed a civil complaint for racketeering and forfeiture under the Arizona Racketeering Act, Arizona Revised Statutes ("A.R.S.") sections 13–2301 to –2318 (2001 & Supp.2002), and the Arizona Forfeiture Reform Act, A.R.S. §§ 13–4301 to –4316 (2001 & Supp.2002). The State alleged that proceeds of participation in the Gambino organized crime family were used to acquire or maintain control of four businesses in Arizona, including Southwest Ecstasy Enterprise ("SEE"), and that SEE was conducted through racketeering, principally by the manufacture and distribution of Ecstasy. The State sought, among other relief, monetary judgments and orders forfeiting the defendants' property.

¶ 5 Meanwhile, in Gravano's criminal case, Gravano asked the court for guidance regarding royalty income from *Underboss* that was to be released to him.[1] The court in this forfeiture action subsequently ordered Gravano to cause the *Underboss* royalties to be deposited with the clerk of the superior court, and Gravano complied.

¶ 6 Gravano moved for dismissal of the portion of the complaint that sought forfeiture of the *Underboss* earnings. He argued that seizure of the *Underboss* proceeds would violate the First Amendment to the United States Constitution, that the book royalties were not proceeds traceable to racketeering, that the civil forfeiture statutes could not be invoked to seize the royalties because no injured person had filed a request for compensation or to intervene,[2] and that the State could not recover the book proceeds under a theory of "substitute assets" because to do so would violate his Sixth Amendment right to counsel in the criminal case against him.

¶ 7 The trial court denied the motion. The court found that the *Underboss* proceeds were traceable to racketeering because "the proceeds would not exist were it not for Mr. Gravano's criminal activities in New York" and because those activities would also violate Arizona's racketeering laws. The court further noted that the forfeiture statutes allowed the State to seize any property that constituted the proceeds of racketeering and, thus, the statutes were not directed solely at published works. The forfeiture statutes, said the court, "provide for full due process before the deprivation of property" and "are content neutral and narrowly drawn." The court concluded that, to the extent application of the forfeiture statutes impact the First Amendment, the laws are justified by compelling state interests and no less restrictive alternative is available. The court also ruled that Gravano's Sixth Amendment rights did not prevail over the forfeiture action and that qualified individuals had timely intervened and asserted a claim to the funds. Finally, in light of its rulings, the court found it unnecessary to address the

---

**1.** The *Underboss* royalties had been withheld from Gravano pending final judgment in a case brought against him, Maas, the publisher, and others by the New York State Crime Victims Board under New York's revised "Son of Sam" law. The trial court in New York ruled that proceeds from sales of the book were not forfeitable in favor of victims of Gravano's crimes because the law applied only to state court convictions-and Gravano was convicted in federal court. *See N.Y. State Crime Victims Bd. v. T.J.M. Prods., Inc.*, 265 A.D.2d 38, 705 N.Y.S.2d 320,

322 (2000). That ruling was affirmed on appeal. *Id.* at 326. We note that, in this case, the State is *not* proceeding under the authority of Arizona's version of the "Son of Sam" law, A.R.S. § 13–4202 (Supp.2001).

**2.** Before the trial court ruled on the motion for partial dismissal, seven victims of Gravano's New York crimes moved to intervene in this forfeiture action.

issue whether the book proceeds could serve as "substitute assets."

¶ 8 The State then moved for partial summary judgment regarding the proceeds of *Underboss*. The State argued that the nexus between Gravano's racketeering and income from the book contract had been established by the court's ruling and that the resulting remedies were mandated by the forfeiture statutes. The State also requested an order forfeiting the book royalties on deposit with the court to the State, subject to the property interests of the interveners. Gravano objected to the motion and alleged that material issues of fact existed that should preclude summary judgment, but did not file a separate statement of facts or otherwise submit admissible evidence controverting the facts asserted by the State.

¶ 9 The trial court granted the State's motion for partial summary judgment. The court ordered that the royalties be forfeited to the State, and the court directed the State to attempt to locate and identify persons injured by Gravano's racketeering activities in New York. Gravano timely appealed from the judgment. We have jurisdiction to decide this appeal pursuant to A.R.S. § 12–120.21(A)(1) (1992).

## ISSUES

¶ 10 Gravano presents the following issues on appeal:

I. Does forfeiture of the *Underboss* royalties violate the First Amendment to the United States Constitution and Article 2, Section 6, of the Arizona Constitution?

II. Are the *Underboss* royalties "proceeds traceable to" racketeering as defined in A.R.S. § 13–2314 (2001)?

III. Does the State have jurisdiction to seize the *Underboss* royalties?

## DISCUSSION

*I. The First Amendment*

¶ 11 Gravano contends that application of the civil forfeiture statutes to the

proceeds of *Underboss* violates the First Amendment and the comparable provision in the Arizona Constitution–Article 2, Section 6. Whether a statute is constitutional as applied is a question of law that we review *de novo. State v. Evenson,* 201 Ariz. 209, 212, ¶ 12, 33 P.3d 780, 783 (App.2001)(review granted in part Apr. 25, 2002); *In re United States Currency in the Amount of $315,900.00,* 183 Ariz. 208, 211, 902 P.2d 351, 354 (App.1995). Legislative enactments are presumed to be constitutional; the party challenging the validity of a statute has the burden of overcoming that strong presumption. *State v. Tocco,* 156 Ariz. 116, 119, 750 P.2d 874, 877 (1988).

¶ 12 Arizona Revised Statutes § 13–2314(A) provides,

> The attorney general or a county attorney may file an action in superior court on behalf of a person who sustains injury to his person, business or property by racketeering ... for the recovery of treble damages and the costs of the suit, including reasonable attorney fees, or to prevent, restrain, or remedy racketeering....

Following a determination of liability, the superior court can order various remedies, including "[p]ayment to the general fund of the state or county as appropriate of an amount equal to the gain that was acquired or maintained through an offense included in the definition of racketeering." A.R.S. § 13–2314(D)(7). The Arizona attorney general may also bring an *in rem* action for forfeiture of "[a]ny property or interest in property acquired or maintained by a person in violation of § 13–2312"[3] and "[a]ll proceeds traceable to an offense included in the definition of racketeering in § 13–2301, subsection D, paragraph 4 and all monies, negotiable instruments, securities and other property used or intended to be used in any manner or part to facilitate the commission of the offense." A.R.S. § 13–2314(G)(1),(3).

¶ 13 Under this statutory scheme, "racketeering" is defined as

---

**3.** Arizona Revised Statutes § 13–2312 (2001) concerns the illegal control and conducting of an

enterprise through racketeering or its proceeds.

any act, including any preparatory or completed offense, that is committed for financial gain, that is chargeable or indictable under the laws of the state in which the act occurred and, if the act occurred in a state other than this state, that would be chargeable or indictable under the laws of this state if the act had occurred in this state and that would be punishable by imprisonment for more than one year, regardless of whether such act is charged or indicted, involving [a list of crimes including, among others, homicide, robbery, theft, bribery, gambling, extortion, and participating in a criminal syndicate].

A.R.S. § 13–2301(D)(4) (2001) (current version in Supp.2002, *as amended by* 2002 Ariz. Sess. Laws, ch. 219, § 9). For the purposes of A.R.S. § 13–2314, the word "proceeds" is defined as "any interest in property of any kind acquired through or caused by an act or omission, or derived from the act or omission, directly or indirectly, and any fruits of this interest, in whatever form." A.R.S. § 13–2314(N)(3).

¶ 14 Gravano argues that application of these forfeiture statutes to seize his royalties from *Underboss* violates the guarantee of freedom of speech contained in the United States and Arizona constitutions because (A) the forfeiture statutes as applied to the royalties are not content-neutral, (B) the State lacks a necessary "compelling state interest" to justify the impingement on Gravano's First Amendment rights, and (C) even if the State has a compelling interest, the forfeiture laws are not narrowly tailored to achieve that interest. We address these arguments in turn.

### A. The Forfeiture Statutes are Content–Neutral.

¶ 15 The threshold question is whether the laws that call for forfeiture of book royalties are content-based, because "[s]tatutory limitations on free speech are subject to varying levels of scrutiny, depending on whether the limitation is content-based or content-neu-

tral." *Evenson,* 201 Ariz. at 212, ¶ 13, 33 P.3d at 783. Gravano argues that the forfeiture of his book royalties imposes a financial burden on him solely because of the content of *Underboss.* He maintains that the State's attempt to seize the royalties is motivated by its disapproval of the content of the book, which depicts Gravano's life in organized crime. Gravano relies on *Simon & Schuster, Inc. v. Members of the New York State Crime Victims Board,* 502 U.S. 105, 112 S.Ct. 501, 116 L.Ed.2d 476 (1991), to support his arguments.

¶ 16 In *Simon & Schuster,* the United States Supreme Court examined the constitutionality of New York's "Son of Sam" law.[4] *Id.* at 108, 112 S.Ct. 501. The law targeted any entity that contracted with an accused or convicted person to produce a depiction of the crime the person had committed or the person's thoughts, feelings, opinions, or emotions regarding the crime by way of several identified works, including a movie, book, magazine article, or radio or television presentation. The law required that the entity submit a copy of the contract to the New York State Crime Victims Board ("the Board") and turn over any income under that contract to the Board. *Id.* The Board was then required to deposit the funds in an escrow account, from which victims of the accused or convicted person could recover after obtaining a money judgment for damages against that person in a civil action. *Id.* The law defined the term "person convicted of a crime" as including "any person convicted of a crime in this state either by entry of a plea of guilty or by conviction after trial and any person who has voluntarily and intelligently admitted the commission of a crime for which such person is not·prosecuted." *Id.* at 110, 112 S.Ct. 501.

¶ 17 The publisher in *Simon & Schuster* contracted to finance and publish a book in which Henry Hill told the story of his organized crime career. *Id.* at 112–13, 112 S.Ct. 501. After the Board learned of the publica-

---

4. The "Son of Sam" term for the law came from the name by which David Berkowitz, a serial killer in New York in 1977, was known. *Simon & Schuster,* 502 U.S. at 108, 112 S.Ct. 501. Acting to prevent Berkowitz from profiting from

his notoriety while his victims and their families were left uncompensated, the New York legislature enacted the statute that was commonly called the "Son of Sam" law. *Id.*

tion of the book, it determined that all monies paid or owed to Hill under the contract were subject to the provisions of the "Son of Sam" law. *Id.* at 114–15, 112 S.Ct. 501. The publisher sued the Board, seeking a declaration that the law violated the First Amendment. *Id.* at 115, 112 S.Ct. 501.

¶ 18 The *Simon & Schuster* Court noted at the outset that "[a] statute is presumptively inconsistent with the First Amendment if it imposes a financial burden on speakers because of the content of their speech." *Id.* (citing *Leathers v. Medlock*, 499 U.S. 439, 447, 111 S.Ct. 1438, 113 L.Ed.2d 494 (1991)). The Supreme Court further noted that "[r]egulations which permit the Government to discriminate on the basis of the content of the message cannot be tolerated under the First Amendment." *Id.* at 116, 112 S.Ct. 501 (quoting *Regan v. Time, Inc.*, 468 U.S. 641, 648–49, 104 S.Ct. 3262, 82 L.Ed.2d 487 (1984)). The Court determined that the "Son of Sam" law was a content-based statute because it "single[d] out income derived from expressive activity for a burden the State place[d] on no other income, and it [wa]s directed only at works with a specified content." *Id. See also Keenan v. Superior Court*, 27 Cal.4th 413, 117 Cal.Rptr.2d 1, 40 P.3d 718, 729 (2002) (concluding that California's "Son of Sam" law establishes a financial disincentive to create or publish works with a particular content and thus is a content-based regulation of speech).

¶ 19 "The principal inquiry in determining content neutrality . . . is whether the government has adopted a regulation of speech because of disagreement with the message it conveys." *Ward v. Rock Against Racism*, 491 U.S. 781, 791, 109 S.Ct. 2746, 105 L.Ed.2d 661 (1989). If a regulation serves purposes unrelated to the content of the expression, it is neutral, even if it incidentally affects some speakers or messages but not others. *Id.* "Government regulation of expressive activity is content neutral so long as it is 'justified without reference to the content of the regulated speech.' " *Id.* (emphasis added to original omitted) (quoting *Clark v. Cmty. for Creative Non–Violence*, 468 U.S. 288, 293, 104 S.Ct. 3065, 82 L.Ed.2d 221 (1984)). The Supreme Court has cau-

tioned, however, that "even a regulation neutral on its face may be content based if its manifest purpose is to regulate speech because of the message it conveys." *Turner Broad. Sys., Inc. v. FCC*, 512 U.S. 622, 645, 114 S.Ct. 2445, 129 L.Ed.2d 497 (1994).

¶ 20 The State argues that we need not examine whether the forfeiture statutes are content-based because the First Amendment does not apply to those statutes. In support, it cites *Alexander v. United States*, 509 U.S. 544, 551, 113 S.Ct. 2766, 125 L.Ed.2d 441 (1993), in which the United States Supreme Court observed that, in the case before it, assets were forfeited under RICO not because they were believed to be obscene but because they were related to Alexander's past racketeering violations. "The RICO forfeiture statute," explained the Court, "calls for the forfeiture of assets because of the financial role they play in the operation of the racketeering enterprise. The statute is oblivious to the expressive or nonexpressive nature of the assets forfeited; books, sports cars, narcotics, and cash are all forfeitable alike under RICO." *Id.*

¶ 21 We disagree with the State that *Alexander* precludes further analysis. Even if the forfeiture statutes at issue can be said to be oblivious to the expressive nature of the royalties, seizure of the royalties nonetheless burdens Gravano's First Amendment rights. The work from which the royalties arise is expressive in nature and, even if the forfeiture laws are content-neutral, the financial disincentive the laws may have on creating or publishing works that present a picture of a life of crime "may effectively drive certain ideas or viewpoints from the marketplace." *Simon & Schuster*, 502 U.S. at 116, 112 S.Ct. 501. Therefore, Arizona's forfeiture statutes, as applied here, implicate First Amendment concerns. Consequently, we must examine the statutes to determine whether they are content-based or content-neutral.

¶ 22 "As a general rule, laws that by their terms distinguish favored speech from disfavored speech on the basis of the ideas or views expressed are content based." *Turner*, 512 U.S. at 643, 114 S.Ct. 2445. "By contrast, laws that confer benefits or impose burdens on speech without reference to the

ideas or views expressed are in most instances content neutral." *Id.* The State argues that Arizona's racketeering forfeiture statutes are not based on the ideas or views expressed in a work, on the work's subject matter or medium of expression, or even on whether any type of expression is involved.

¶ 23 Whether a statute's burden on expression is content-based turns on its primary purposes rather than its incidental effects; "statutes [a]re content neutral where they [a]re intended to serve purposes unrelated to the content of the regulated speech, despite their incidental effects on some speakers but not others." *Simon & Schuster,* 502 U.S. at 122 n. *, 112 S.Ct. 501. "Content," in the constitutional sense, refers to the particular ideas or viewpoints that are expressed. *Ariz. Dep't of Revenue v. Great W. Publ'g, Inc.,* 197 Ariz. 72, 78, ¶ 23, 3 P.3d 992, 998 (App.1999).

¶ 24 Arizona's forfeiture statutes contain no reference to the content of speech or expressive materials. As the State suggests, the purposes of these statutes apparently include removing the economic incentive to engage in racketeering, reducing the financial ability of racketeers to continue to engage in crime, preventing unfair business competition by persons with access to crime proceeds, compensating victims of racketeering, and reimbursing the State for the costs of prosecution. These purposes are speech- and content-neutral, and any effect on speech is incidental.

¶ 25 Furthermore, the forfeiture statutes as applied here are content-neutral. The forfeiture laws come into play based on the existence of a causal connection between racketeering and property. As the State asserts, when forfeiture of book proceeds is sought, the causal connection between racketeering conduct and the proceeds is present if the commercial value of the book contract is substantially the result of racketeering. In other words, a causal connection exists if the storyteller's notoriety from racketeering is what makes the story marketable. In contrast, a causal connection to racketeering may be absent even if a work includes a

description of crimes, if the crimes do not fall within the definition of racketeering or do not enhance the story's or the storyteller's commercial value.[5] Thus, whether proceeds of an expressive work are forfeitable under the statutory scheme does not depend on the content of the work, and the *Underboss* royalties owed to Gravano may be subject to forfeiture regardless of the message conveyed in the book if a causal connection between racketeering and the proceeds exists. Accordingly, the forfeiture statutes as applied here are content-neutral.

### B. Although Not Required, Compelling State Interests are Served by the Forfeiture Statutes.

¶ 26 The most exacting scrutiny is applied to regulations that suppress, disadvantage, or impose different burdens on speech because of its content. *Turner,* 512 U.S. at 642, 114 S.Ct. 2445. Under this heightened standard, "[i]n order to justify such differential treatment, 'the State must show that its regulation is necessary to serve a compelling state interest and is narrowly drawn to achieve that end.'" *Simon & Schuster,* 502 U.S. at 118, 112 S.Ct. 501 (quoting *Ark. Writers' Project, Inc. v. Ragland,* 481 U.S. 221, 231, 107 S.Ct. 1722, 95 L.Ed.2d 209 (1987)). On the other hand, content-neutral regulations are subject to an intermediate level of scrutiny because, in general, "they pose a less substantial risk of excising certain ideas or viewpoints from the public dialogue." *Turner,* 512 U.S. at 642, 114 S.Ct. 2445. Thus, statutes that place only an incidental burden on free speech do not violate the First Amendment "if they further 'an important or substantial governmental interest; if the governmental interest is unrelated to the suppression of free expression; and if the incidental restriction on alleged First Amendment freedoms is no greater than is essential to the furtherance of that interest.'" *Ariz. Libertarian Party v. Schmeral,* 200 Ariz. 486, 490–91 n. 3, ¶ 13, 28 P.3d 948, 952–53 n. 3 (App.2001) (quoting

---

5. In this case, counsel for Gravano conceded at oral argument that the commercial value of *Un-*   *derboss* was enhanced by Gravano's criminal history and notoriety.

*Martin v. Reinstein,* 195 Ariz. 293, 320–21, ¶ 98, 987 P.2d 779, 806–07 (App.1999) [6]).

¶ 27 Although in this case the State need only show an important or substantial governmental interest in the forfeiture statutes, the State argues that it can show compelling interests. In *Simon & Schuster,* the Supreme Court noted (and at oral argument, counsel for Gravano conceded) that "[t]here can be little doubt ... that the State has a compelling interest in ensuring that victims of crime are compensated by those who harm them." 502 U.S. at 118, 112 S.Ct. 501. In addition, said the Court, states have "an undisputed compelling interest in ensuring that criminals do not profit from their crimes." *Id.* at 119, 112 S.Ct. 501. The Court recognized the equitable principle that "[n]o one shall be permitted to profit by his own fraud, or to take advantage of his own wrong, or to found any claim upon his own iniquity, or to acquire property by his own crime." *Id.* (quoting *Riggs v. Palmer,* 115 N.Y. 506, 22 N.E. 188, 190 (1889)). The Supreme Court also noted that "[t]he force of this interest is evidenced by the State's statutory provisions for the forfeiture of the proceeds and instrumentalities of crime." *Id.*

¶ 28 Gravano argues, however, that the State of Arizona lacks compelling interests in his case because the royalties come from a book based on activities and crimes perpetrated and prosecuted in New York, and the victims do not live in Arizona. The State responds that the location of the crime or the victims does not lessen the State's interest in the proceeds of the offense, in part because organized crime is a national problem that can be controlled most effectively if states are able to enforce their own laws to benefit a nationwide effort.

¶ 29 In *State ex rel. Corbin v. Pickrell,* 136 Ariz. 589, 597, 667 P.2d 1304, 1312 (1983), the Arizona Supreme Court rejected the argument that the Arizona attorney general was without authority to redress racketeering wrongs committed against non-residents of Arizona. Our supreme court noted that nothing in A.R.S. § 13–2314(A) restricted the State to protecting only residents of Arizona. *Id.* We acknowledge that, in *Pickrell,* the injuries suffered by the out-of-state residents resulted from wrongs committed, at least in part, by Arizona enterprises. *See id.* Nevertheless, our supreme court's statement, that the fact that Arizona "is willing to provide aid in redressing these wrongs [on behalf of out-of-state residents] is evidence that the state is serious in its fight to eradicate organized crime," *id.,* lends support to the position that Arizona has a compelling interest in assisting out-of-state racketeering victims when the person who victimized them has become an Arizona resident.

¶ 30 Furthermore, the State has a compelling interest in reducing the economic power of criminals and criminal enterprises that come into Arizona, regardless of where their racketeering proceeds originated. The effectiveness of forfeiture laws in addressing racketeering crimes would be greatly diminished if all that a person had to do to escape forfeiture would be to take such proceeds from the state in which the crime was committed to another state. Likewise, a victim of a racketeering crime has little remedy if the racketeer can avoid forfeiture by moving himself or herself, or the property, across the state line. In fact, Arizona's definition of racketeering includes acts that are committed in other states that would be chargeable or indictable under Arizona law, thus indicating that the legislature intended Arizona's remedial statutes to reach beyond crimes committed only in Arizona. *See* A.R.S. § 13–2301(D)(4). We therefore conclude that Arizona has a compelling interest in ensuring that victims of crime are compensated and in ensuring that criminals do not profit from their crimes when the criminal has relocated to Arizona, even if the victims do not reside in Arizona and the crimes were committed elsewhere.

### C. The Forfeiture Laws are Narrowly Tailored.

¶ 31 We next consider whether the forfeiture laws' incidental restriction on freedom of

---

**6.** *Martin* cited *United States v. Albertini,* 472 U.S. 675, 687–88, 105 S.Ct. 2897, 86 L.Ed.2d 536 (1985), which quoted *United States v. O'Brien,* 391 U.S. 367, 377, 88 S.Ct. 1673, 20 L.Ed.2d 672 (1968).

speech is no greater than is essential to the furtherance of the State's compelling interests. *See Schmeral,* 200 Ariz. at 490–91 n. 3, ¶ 13, 28 P.3d at 952–53 n. 3. In *Simon & Schuster,* the United States Supreme Court addressed a similar question under the "narrowly tailored" standard and concluded that New York's "Son of Sam" law was "significantly overinclusive" because it applied to works on any subject that expressed the author's thoughts or recollections about his crime, even tangentially or incidentally, and its broad definition of the phrase "person convicted of a crime" caused the escrow of income of any author who admitted in his work to having committed a crime, even if he or she had never been accused or convicted of the crime. 502 U.S. at 121, 112 S.Ct. 501. The State argues that these concerns do not apply to Arizona's forfeiture laws. We agree.

¶ 32 Arizona's forfeiture statutes apply only to the proceeds of racketeering. Therefore, the statutes affect only speech that constitutes the proceeds of racketeering-in furtherance of the State's compelling interests. Forfeiture should not occur if the expressive material mentions a crime only tangentially or incidentally; Arizona's law is based on a causal connection with racketeering, not just a mention of it in an expressive work. The *Simon & Schuster* Court criticized the "Son of Sam" law because, under the law, "[s]hould a prominent figure write his autobiography at the end of his career, and include in an early chapter a brief recollection of having stolen (in New York) a nearly worthless item as a youthful prank, the Board would control his entire income from the book for five years, and would make that income available to all of the author's creditors." 502 U.S. at 123, 112 S.Ct. 501. That is not the factual scenario we face here, and this outcome, in all likelihood, would not be possible under Arizona's forfeiture laws. Additionally, the Supreme Court's concern that the "Son of Sam" law would encompass works by persons who committed crimes of civil disobedience and crimes related to campaigns for civil rights, *id.* at 121–22, 112 S.Ct. 501, does not apply to the forfeiture laws because forfeiture is available only when a racketeering crime is involved and the expressive work has a causal connection with racketeering. As the State notes, a mere crime of conscience would not trigger a racketeering remedy.

¶ 33 Furthermore, the forfeiture laws afford full due process before depriving a person of his or her property. In *Opinion of the Justices to the Senate,* 436 Mass. 1201, 764 N.E.2d 343, 351–52 (2002), the Massachusetts Supreme Court found that a proposed "Son of Sam"-type law violated the First Amendment, in part because the seizure of the proceeds of written work was determined by a non-judicial body in a decision that was final unless the contracting party sought judicial review. The contracting party then had the burden of demonstrating error under a standard that gave deference to the agency's decision. *Id.* at 352. In contrast, Arizona's forfeiture laws require the State to file an action in court and to prove the underlying racketeering and the connection between the racketeering and the property subject to forfeiture. The burden of proof is on the State, and civil procedural rules are applied. Therefore, the due process concerns expressed by the Massachusetts Supreme Court are not present in Arizona's forfeiture statutes.

¶ 34 In sum, the application of Arizona's forfeiture laws is limited to preventing racketeers from benefitting from their crimes, and to compensate victims for their losses and the State for costs incurred in the prosecution of racketeers. We conclude that Arizona's forfeiture statutes not only survive intermediate scrutiny, but also are narrowly tailored to further the compelling interests of the State, and therefore satisfy a strict statutory standard as well. We therefore hold that Arizona's forfeiture statutes, as applied to Gravano's royalties from *Underboss,* do not violate either federal or state freedom of speech provisions.[7]

---

7. The Arizona Constitution provides greater speech rights than the United States Constitution. *Mountain States Tel. & Tel. Co. v. Ariz. Corp. Comm'n,* 160 Ariz. 350, 354, 773 P.2d 455, 459 (1989). However, that greater protection "lies in the Arizona Constitution's extension of free speech rights to cover not only speech limitations imposed by the government, but also

## II. The Proceeds of Racketeering

¶ 35 Gravano argues that the *Underboss* proceeds are not subject to the forfeiture provisions of A.R.S. § 13 2314(G)(1) and (3), because the contract royalties are the product of his lawful labor in working with the author of the book and the connection between the royalties and the commission of racketeering acts is incidental or fortuitous. We review *de novo* the trial court's interpretations of A.R.S. § 13–2301, the statute defining "racketeering," and A.R.S. § 13–2314(G), the racketeering forfeiture statute. *In re 1996 Nissan Sentra Vin: 1N4AB41D1TC74220 Az Lic: 162ARH,* 201 Ariz. 114, 117, ¶ 8, 32 P.3d 39, 42 (App.2001).

¶ 36 The State's motion for partial summary judgment was based primarily on A.R.S. § 13–2314(G), which provides for the forfeiture of any property or interest in property acquired or maintained by a person in violation of racketeering enterprise laws, and the forfeiture of all proceeds traceable to an offense included in the definition of racketeering. *See* A.R.S. § 13–2314(G)(1), (3). The State identifies the property in question as the contract rights received by Gravano under his agreement to collaborate in the publication of *Underboss.* The racketeering conduct relevant to the forfeiture complaint includes the acts of murder and extortion that Gravano admitted as part of his 1991 plea agreement.

¶ 37 Although the State argues that both paragraphs (1) and (3) of subsection (G) provide for forfeiture of the *Underboss* royalties, we conclude that it is paragraph (3) that supports the trial court's order of forfeiture. This provision concerns "[a]ll proceeds traceable" to a racketeering offense. As we noted earlier, the word "proceeds" is broadly defined as including "any interest in property of any kind acquired through or caused by an act or omission, or derived from the act or omission, directly or indirectly, and any fruits of this interest, in whatever form." A.R.S. § 13–2314(N)(3). Gravano's rights under his contract qualify as "property" under A.R.S.

§ 13–105(32) (2001), which defines the word "property" as "anything of value, tangible or intangible."

¶ 38 Under these statutory definitions, the royalties are proceeds of racketeering because they were "caused by" or, in other words, resulted from Gravano's racketeering acts, at least indirectly. The phrase "caused by" involves a causal relationship between conduct and result, which A.R.S. § 13–203(A) (2001) explains as follows:

> A. Conduct is the cause of a result when both of the following exist:
>
> 1. But for the conduct the result in question would not have occurred.
>
> 2. The relationship between the conduct and result satisfies any additional causal requirements imposed by the statute defining the offense.

Because A.R.S. § 13–2314 does not contain any additional causal requirements relevant here, causation of the proceeds is determined by the "but for" test of § 13–203(A)(1).

¶ 39 We agree with the State that Gravano would not have acquired the contract rights and resulting royalties "but for" his racketeering activities. At oral argument, counsel for Gravano conceded that there was a "substantial connection" between Gravano's criminal activities in New York and the resulting notoriety, and the book contract offered by the publisher, Harper Collins (UK), Inc. Without question, it was Gravano's notoriety from that conduct that made his story marketable and of commercial value. Although arguably the causation here is indirect, the definition of "proceeds" allows for such indirect causation. Therefore, a causal connection exists between Gravano's racketeering activities, the book contract, and the fruits of that contract.

¶ 40 Also, the fact that Gravano contributed effort that was not directly unlawful to the book does not take the royalties out of the reach of the forfeiture statutes. A similar argument was made in *United States v. De-Fries,* 129 F.3d 1293, 1312–13 (D.C.Cir.1997),

---

speech limitations emanating from other sources." *Evenson,* 201 Ariz. 209, 218 n. 15, ¶ 33, 33 P.3d 780, 789 n. 15. Accordingly, we believe our analysis of the forfeiture laws under

federal constitutional principles is equally applicable to and adequately supports the constitutionality of these statues under Article 2, Section 6, of the Arizona Constitution.

in which union officials who gained office through ballot tampering argued that their salaries should not be forfeited under RICO forfeiture provisions, because the government had failed to establish an adequate causal link between the ballot tampering and the electoral wins that afforded them their salaries. The circuit court noted that the district court's findings could sustain the necessary causal inference and concluded that the officials could not contest that "but for" the elections tainted by racketeering activity, they would not have received their salaries. *Id.* at 1313.

¶ 41 Similarly, even if Gravano earned his book royalties by his effort in the same manner that the union officials earned their salaries by their work, "but for" Gravano's racketeering activities, he would not have been in the position to enter into the contract that called for him to expend the effort to earn the royalties. What Gravano proposes amounts to an exclusive cause test that would prevent forfeiture if any legal act contributes to proceeds that also have a racketeering cause. Such a test would largely negate the effect of forfeiture provisions in situations in which racketeering proceeds are funneled into and used by a lawful business or in which, for example, a company involved in a legal business is also engaged in extortion. An exclusive cause test is not supported by our statutes and, therefore, Gravano's efforts do not break the causal connection necessary for the proceeds of the book to be forfeitable.

### III.   Jurisdiction Over the Property

■ ¶ 42 Gravano also asserts that the State lacks jurisdiction over the *Underboss* royalties. He maintains that this is so because Arizona has no connection with his crimes, the victims and their families, or the publication of the book.

¶ 43 In the State's statement of facts supporting its motion for partial summary judgment, the State declared,

The Superior Court in and for Maricopa county has jurisdiction to enter appropriate orders both prior to and following a determination of liability pursuant to A.R.S. § 13–2314, including forfeiture or-

ders pursuant to A.R.S. §§ 13–2314 and 13–4301, *et. seq.*, particularly 13–4302.

Gravano did not directly controvert this statement in the trial court.

¶ 44 Under the heading of "Jurisdiction," A.R.S. § 13–4302 (2001) provides,

The state may commence a proceeding in the superior court if the property for which forfeiture is sought is within this state at the time of the filing of the action or if the courts of this state have in personam jurisdiction of an owner of or interest holder in the property.

Because Gravano was a resident of Arizona at the time the forfeiture proceeding was filed, the courts of this state had *in personam* jurisdiction over him.

■ ¶ 45 Additionally, an Arizona trial court generally has *in rem* jurisdiction over property that is located in Arizona. *See In re Approx. $50,000.00 in United States Currency,* 196 Ariz. 626, 629, ¶ 7, 2 P.3d 1271, 1274 (App.2000). The proceeds are in Arizona and came here only after Gravano requested direction from the court and represented that he would follow such direction. Furthermore, because the property at issue consists of, and has its genesis in, Gravano's rights under the book contract, which are intangible property, such property was located in Arizona because Gravano was a resident here. *See Kelly v. Bastedo,* 70 Ariz. 371, 377, 220 P.2d 1069, 1073 (1950) (concluding that the site of intangibles is with the owner). Therefore, the courts of Arizona have jurisdiction over this forfeiture proceeding.

### CONCLUSION

¶ 46 Arizona's forfeiture statutes as applied to Gravano's book royalties do not violate the free speech guarantees of the United States and Arizona constitutions. Furthermore, the proceeds of the book contract are subject to forfeiture because they are casually connected to Gravano's racketeering crimes. The judgment of the trial court is affirmed.

CONCURRING: PHILIP HALL, Presiding Judge and EDWARD C. VOSS, Judge.