IN THE

# ARIZONA COURT OF APPEALS

DIVISION TWO

_____

THE STATE OF ARIZONA,
*Appellee*,

*v.*

ADRIEL GUEVARA-ENRIQUEZ,
*Appellant.*

No. 2 CA-CR 2024-0054
Filed July 25, 2025

_____

Appeal from the Superior Court in Pima County
No. CR20191616001
The Honorable Christopher C. Browning, Judge

**AFFIRMED**

_____

COUNSEL

Kristin K. Mayes, Arizona Attorney General
Alice M. Jones, Deputy Solicitor General/Section Chief of Criminal Appeals
By Tanja K. Kelly, Assistant Attorney General, Tucson and Joseph E. Begun,
Assistant Attorney General, Phoenix
*Counsel for Appellee*

Megan Page, Pima County Public Defender
By David J. Euchner, Assistant Public Defender, Tucson
*Counsel for Appellant*

## OPINION

Judge Vásquez authored the opinion of the Court, in which Presiding Judge Eckerstrom and Judge Sklar concurred.

V Á S Q U E Z, Judge:

**¶1** Adriel Guevara-Enriquez appeals his convictions and sentences for sexual conduct with a minor. He argues the trial court erred by failing to remove a disqualified juror and allowing the jury to see the victim's facility dog. He also argues the court violated his confrontation rights by permitting a DNA analyst to testify about statements made by other non-testifying lab team members. We affirm.

## Factual and Procedural Background

**¶2** We view the facts in the light most favorable to sustaining the jury's verdicts. *State v. Felix*, 237 Ariz. 280, ¶ 30 (App. 2015). In 2019, Guevara-Enriquez and his girlfriend were visiting his girlfriend's family in Tucson. One morning, Guevara-Enriquez forcefully undressed nine-year-old M.R. before attempting to penetrate her vagina with his penis. He then performed oral sex on her while she begged him to stop.

**¶3** Guevara-Enriquez was charged with two counts of sexual conduct with a minor under fifteen.[1] After a six-day jury trial, he was convicted of both counts. The trial court sentenced him to consecutive life sentences without the possibility of release for thirty-five years. This appeal followed. We have jurisdiction under A.R.S. §§ 12-120.21(A)(1), 13-4031, and 13-4033(A)(1).

## Discussion

### I. Juror 5's Qualification to Serve as a Juror

**¶4** Guevara-Enriquez argues Juror 5 was disqualified from sitting on the jury under A.R.S. § 21-211 because of her husband's employment with the Pima County Sheriff's Department, the agency that

---

[1]The state also charged Guevara-Enriquez with one count of kidnapping, but the trial court dismissed that charge on the state's motion before trial.

had investigated the case.[2]  We review issues of statutory interpretation de novo.  *State v. Luviano*, 255 Ariz. 225, ¶ 7 (2023).

¶5            The United States and Arizona constitutions afford a criminal defendant the right to be tried by a fair and impartial jury.  *See Morgan v. Illinois*, 504 U.S. 719, 726 (1992) (due process clauses of United States Constitution's Sixth and Fourteenth amendments independently guarantee trial by impartial jury); Ariz. Const. art. II, § 24 (accused in criminal prosecutions guaranteed right to "an impartial jury").  "When there is reasonable ground to believe that a juror cannot render a fair and impartial verdict, the court, on its own initiative, . . . shall excuse the juror from service in the case."  *State v. Bush*, 244 Ariz. 575, ¶ 42 (2018) (quoting Ariz. R. Crim. P. 18.4 (2011)); *see* Ariz. R. Crim. P. 18.4(b) (2022).

¶6            Under § 21-211(2), a person who is "interested directly or indirectly in the matter under investigation" is "disqualified to serve as [a] juror[] in any particular action."  This bar "serves at least three goals: (1) preserving the right to a fair trial by impartial jurors, (2) ensuring that jurors derive their knowledge about the case solely from information presented at trial to the jurors collectively, and (3) protecting the appearance of fairness, which helps instill public confidence in the judicial system."  *State v. Eddington*, 228 Ariz. 361, ¶ 8 (2011); *see also* Ariz. R. Crim. P. 18.4(b) (requiring trial court to excuse prospective jurors for cause "if there is a reasonable ground to believe" they "cannot render a fair and impartial verdict").  Our supreme court has concluded that "[t]he working relationship between the prosecution and the investigating agency is the type of interest § 21-211(2) is meant to cover."  *Eddington*, 228 Ariz. 361, ¶ 18.

¶7            In *Eddington*, the court addressed "whether a peace officer employed by the law enforcement agency that investigated a criminal case"

---

[2]Guevara-Enriquez argues the alleged error was structural because "Arizona's elimination of peremptory challenges leaves the defendant with no way to rectify a trial court's error in failing to disqualify a biased juror." Because we conclude the trial court acted within its discretion by not sua sponte striking Juror 5 for cause, we need not address this argument.  *See State v. Diaz*, 223 Ariz. 358, ¶ 11 (2010) ("Regardless of how an alleged error ultimately is characterized, . . . a defendant on appeal must first establish that some error occurred.").

has a disqualifying interest under § 21-211(2).[3] 228 Ariz. 361, ¶ 1. The court held that "a peace officer currently employed by the law enforcement agency that investigated the case is an 'interested person' who is disqualified from sitting as a juror." *Id.* Here, the Pima County Sheriff's Department investigated Guevara-Enriquez's case. And during voir dire, Juror 5 stated that her husband "works for the Pima County Sheriff's Department" in the "Correctional Department." Guevara-Enriquez maintains that whether Juror 5's husband was a peace officer is "of no consequence" because the "logic [in *Eddington* is not] restricted to peace officers." Relying on *Eddington*, he argues that, if Juror 5's "husband could not serve on this jury because he could potentially feel pressure from coworkers, then he could receive the same pressure based on his wife's service." Guevara-Enriquez claims that "[a]ny potential harm to his employment with the Pima County Sheriff's [Department], therefore, necessarily harms Juror 5 equally." But any potential harm to the employment of Juror 5's husband stemming from Juror 5 serving on the jury is mere speculation.

¶8        Guevara-Enriquez identifies several considerations that, in his view, are sufficient to extend the statutory bar preventing an interested person from serving on a jury to that interested person's spouse. He claims that Juror 5 had "no less financial 'interest' in her husband's employment" than him because, under the community property statute, most property acquired by either spouse during the marriage is community property. *See* A.R.S. § 25-211. Guevara-Enriquez thus contends that "[a]ny potential harm to his employment with the Pima County Sheriff's [Department], therefore, necessarily harms Juror 5 equally because lost earnings are community property." Relatedly, he asserts that the potential pressure from Juror 5's husband's coworkers based on his spouse's service could potentially impact his future working relationships. Guevara-Enriquez therefore claims that if Juror 5's husband were fired from the investigating agency and then sued for wrongful termination, that Juror 5 would be required to join as a plaintiff in the case.

¶9        Guevara-Enriquez's argument assumes that Juror 5's husband would be categorically disqualified from jury service under the criteria set forth in *Eddington*. But Guevara-Enriquez has not provided this court with an adequate record to assess whether, as an employee of the investigating agency who does not serve in a division tasked with criminal investigation, that criteria would logically apply in the instant case. This

---

[3]The court noted that it was using the term "peace officer" as it is defined in A.R.S. §§ 1-215(28) and 13-105(29). *Eddington*, 228 Ariz. 361, n.1.

court has no factual record whatsoever describing her husband's level of interaction with the investigations unit, his level of access, by formal or informal means, to details of the investigation, or his dependence on the good will of those overseeing investigations for any promotion. *See Eddington*, 228 Ariz. 361, ¶¶ 11-13. We therefore cannot conclude on the record before us that the husband's employment as a corrections officer would create an "interest" in Guevara-Enriquez's case such that his service on the jury would raise the type of concerns contemplated by § 21-211(2). *See id*.

¶10            But even assuming Juror 5's husband would be disqualified as a juror in this case under § 21-211(2), we decline to expand *Eddington* to include such person's spouse to protect against speculative risks unsupported by the evidence in this case. By their terms, neither § 21-211(2) nor *Eddington* apply to a spouse of an employee of the investigating agency. And we are unpersuaded by Guevara-Enriquez's argument that *Eddington*'s logic necessarily extends to spouses. Guevara-Enriquez correctly argues that spouses have financial interests in their spouses' continued employment. But jury service poses a more attenuated risk to those interests than the risks that underlie *Eddington*'s categorical prohibition on jury service by peace officers of the investigating agency. To the extent that such risks exist in individual cases, the court is equipped to address those during voir dire. The trial court thus did not err by concluding that Juror 5 was not disqualified from serving on the jury as an interested party under the statute.

¶11            Aside from § 21-211, a trial court must excuse prospective jurors for cause "if there is a reasonable ground to believe" they "cannot render a fair and impartial verdict." Ariz. R. Crim. P. 18.4(b). "[E]xcusing jurors is committed to the sound discretion of the trial court," and we will not set aside a court's decision whether to strike a juror for cause "absent clear and prejudicial abuse of that discretion." *State v. Milke*, 177 Ariz. 118, 122 (1993); *see also State v. Colorado*, 256 Ariz. 97, ¶ 23 (App. 2023). By not excusing Juror 5, the court implicitly determined she could serve as a fair and impartial juror. The record supports that determination.

¶12            During voir dire, the trial court explained that law enforcement officers must be "treated just the same [as other witnesses], and their testimony [is] to be evaluated by the exact same standards as any other witness." It then asked if any of the prospective jurors had any experience with law enforcement that "might make [them] tend to believe or disbelieve, even to a small degree, the testimony of a law enforcement officer more or less than the testimony of someone who is not a law enforcement officer." None of the jurors raised their hands. Then, the court

asked if anyone had a relative or close friend who was ever "law enforcement affiliated." Juror 5 was one of several people who answered affirmatively, but she stated that she would "judge [deputies' testimony] by the same standards as anyone else." She also confirmed it "wouldn't be a problem" for her not to talk about the case with anyone, including her husband, until it was over. Juror 5 expressly stated that she and her husband "made an agreement at the start, he doesn't bring work home." As Guevara-Enriquez acknowledges, neither he nor the state moved to strike Juror 5. Although he argues Rule 18.4(b) required the court to remove Juror 5 sua sponte, on this record, we disagree. *See State v. Jimenez*, 255 Ariz. 550, ¶¶ 8-10, 13. For all these reasons, Guevara-Enriquez has not established error related to Juror 5. *See State v. Escalante*, 245 Ariz. 135, ¶ 21 (2018).

## II. Constitutionality of Facility Dog Statute

**¶13** Guevara-Enriquez challenges the facial constitutionality of A.R.S. § 13-4442, as well as its validity as applied to him. Under that statute, a trial court must allow a facility dog to accompany a minor victim while he or she is testifying in court. *Id.* We review alleged constitutional violations de novo. *State v. Sanders*, 245 Ariz. 113, ¶ 89 (2018). To prevail on a facial challenge, Guevara-Enriquez must demonstrate there are no circumstances under which the statute could be found valid. *State v. Wein*, 244 Ariz. 22, ¶ 34 (2018). "An 'as-applied' challenge assumes the standard is otherwise constitutionally valid and enforceable, but argues it has been applied in an unconstitutional manner to a particular party." *Korwin v. Cotton*, 234 Ariz. 549, ¶ 32 (App. 2014). "Because there is a strong presumption in favor of a statute's constitutionality, the challenging party bears the burden of proving its unconstitutionality." *State v. Arevalo*, 249 Ariz. 370, ¶ 9 (2020); *see State ex rel. Napolitano v. Gravano*, 204 Ariz. 106, ¶ 11 (App. 2002) (presumption of constitutionality and challenging party's burden both exist in "as-applied" constitutional challenge).

**¶14** Guevara-Enriquez argues § 13-4442 is facially unconstitutional because it violates separation of powers by "infring[ing] on the judicial rulemaking authority and the trial judge's duty to manage the courtroom." This court considered and rejected this claim when Guevara-Enriquez previously raised it by special action. *See State v. Browning*, 256 Ariz. 565 (App. 2023). Guevara-Enriquez does not present a sufficient basis for reconsidering that decision, and we decline to do so. *See State v. Wilson*, 207 Ariz. 12, ¶ 9 (App. 2004) (court has discretion under law of the case doctrine to refuse to reopen questions previously decided in same case by same court).

¶15 Guevara-Enriquez next argues § 13-4442 "is applied in an unconstitutional manner when the jury is caused to see the facility dog." The majority of his "as-applied" argument was presented and decided in the special action. In this appeal, we will limit our discussion to addressing the one argument not already decided in *Browning*. *See Wilson*, 207 Ariz. 12, ¶ 9. Specifically, Guevara-Enriquez argues that *Browning*'s application of § 13-4442 required the trial court to "take actions that the statute did not require." He points to a pretrial discussion about how the state "intend[ed] to use the facility dog." During that discussion, the court denied Guevara-Enriquez's request that the "dog and [M.R.] be seated prior to the jury entering" in order to "minimize prejudice to [him]." In denying this request, the court stated it interpreted *Browning* as permitting the jury to see the dog. At trial, the court ordered that M.R. be "up on the stand with the dog before the jury [came] in." But at oral argument in this court, the parties agreed that at the end of M.R.'s trial testimony, the jurors saw the dog when she stepped down from the witness stand. These facts belie Guevara-Enriquez's assertions that the court "believed it had no discretion on the issue of the jury seeing the dog."

¶16 Moreover, during voir dire, the trial court asked jurors if there was "anything about just the fact of the presence of a dog in a room that is going to affect [their] ability to be fair and impartial?" No one raised their hand in response to this question. And during preliminary and final instructions, the court reminded the jury that the "dog's presence is not and should not be a reflection on the truthfulness or credibility of any testimony that is offered by the witness" and that the "presence of the dog should not influence [their] deliberations in any way." *See State v. Newell*, 212 Ariz. 389, ¶ 68 (2006) ("We presume that the jurors followed the court's instructions."). We conclude there was no error.[4]

### III. DNA Analyst

¶17 Guevara-Enriquez argues that, because the state's testifying expert provided DNA analysis that "depended on the validity, accuracy, and truth" of the "work and conclusions" of other lab team members who did not testify, his confrontation right was violated. "We review de novo

---

[4]We will not separately address Guevara-Enriquez's argument that the trial court committed an error of law and thus abused its discretion by "reading *Browning* to require the jury to see the facility dog," which relies on the same factual basis from which we determined the court did not err.

whether the admission of evidence violates the Confrontation Clause."
*State v. Joseph*, 230 Ariz. 296, ¶ 7 (2012).

**¶18**        As a threshold matter, Guevara-Enriquez did not object to the
DNA analyst's testimony at trial.   Generally, the failure to raise a
Confrontation Clause challenge in the trial court forfeits review for all but
fundamental, prejudicial error.  *State v. Allen*, 253 Ariz. 306, ¶¶ 15, 34 (2022).
Guevara-Enriquez argues, however, that he preserved this issue for
appellate review.  He maintains that any objection to the admission of the
DNA analyst's testimony at trial would have been "frivolous" at the time
because this court had found no confrontation violation in *State v. Ortiz*, 238
Ariz. 329 (App. 2015).  He argues that, since his trial and conviction, *Smith
v. Arizona*, 602 U.S. 779 (2024), has "overrule[d] this precedent," thereby
"constitut[ing] a significant change in the law."  *See Reed v. Ross*, 468 U.S. 1,
16 (1984) ("[W]e hold that where a constitutional claim is so novel that its
legal basis is not reasonably available to counsel, a defendant has cause for
his failure to raise the claim in accordance with applicable state
procedures.").

**¶19**        The state argues that *Reed* only applies when "the state of the
law at the time . . . did not offer a 'reasonable basis' upon which to
challenge" the evidence.  468 U.S. at 16-17.  It contends this occurs when
"the Supreme Court explicitly overrules one of its precedents; 'overturn[s]
a longstanding and widespread practice to which [the] Court has not
spoken, but which a near-unanimous body of lower court authority has
expressly approved'; and when the Supreme Court disapproves of a
practice it has 'arguably . . . sanctioned in prior cases.'"  *Id.* at 17.  The state
asserts that none of  these scenarios apply to *Smith*.   Instead, it claims two
other Supreme Court cases, *Melendez-Diaz v. Massachusetts*, 557 U.S. 305
(2009) and *Bullcoming v. New Mexico*, 564 U.S. 647 (2011), are the "state of
the law" and those cases were expressly not overruled in *Smith*.  Therefore,
*Smith* was not a change in the law but a "clarif[ication of] a recurring issue
that was frequently litigated." In *Smith*, the Court explained that not
having the original "maker of the statements," meaning the original expert,
in the courtroom available for questioning would "make our decisions in
*Melendez-Diaz* and *Bullcoming* a dead letter, and allow for easy evasion of
the Confrontation Clause."  602 U.S. at 798.  Therefore, the state claims an
objection would not have been "futile" here, and it would have at least
allowed for proper development of the record to review the claims
Guevara-Enriquez now raises on appeal.

**¶20**        Relying on *Smith*, Guevara-Enriquez claims that the testifying
DNA analyst's "opinions depended on the truth and accuracy of the
samples being what they purported to be in the case notes and the truth and

accuracy of the profiles purportedly obtained and developed from those samples." He therefore argues that the analyst's testimony could not be admitted unless the state also provided "testimony from the sampler and technician." In *Smith*, the analyst who had tested the drug substance did not testify at trial. 602 U.S. at 789-90. Instead, a substitute expert with no prior connection to the case reviewed the lab reports and analyst's notes, told the jury what those records conveyed about the analyst's testing of the items, and offered an "independent opinion" of the chemical nature of those items. *Id.* at 791. The Supreme Court determined that the analyst's statements had been admitted for their truth. *Id.* at 798. And the Court held it is improper for a substitute expert to introduce the testimonial out-of-court statements of a forensic analyst at trial, unless the analyst is unavailable and the defendant had a prior opportunity to cross examine the analyst. *Id.* at 802-03.

¶21 Here, the state's expert witness worked as a DNA analyst at the same lab that processed the forensic evidence. The lab uses a "technician based system" in which "different teams" perform the "different steps of the DNA analysis," rather than one person "doing every step of the work." At trial, the analyst testified extensively as to the lab's processes, from the "moment [they] receive evidence" through publishing of the report.[5] The testifying analyst's role in this case was to "review anything that[ had] been done in [the] case file, take ownership of it, examine the DNA profiles obtained from evidence, make comparisons, calculate statistics, generate reports, and then testify in court proceedings to those reports."

¶22 The testifying analyst stated that, in every case, the DNA analyst assigned to testify must review "all of the documentation" generated by others at "every single" prior step and perform an

_____

[5]In this case, four reports were generated. The testifying analyst authored three of those four. Typically, the lab requires that whoever "authored the first report" will also author "every corresponding report from there on after" for the "purposes of . . . the testimony in [court] proceedings." However, the author of the first report stopped working at the lab. Before completing the subsequent reports, the testifying analyst was "required to go back and review and confirm that [she] agree[d] with everything that was in that first report." This review included checking that the quality assurance steps had been properly followed, and that the testifying analyst would have independently come to the same conclusions as the initial analyst. The testifying analyst had also "complete[d] some of the lab work that was part of [the first] report."

independent series of checks to ensure the accuracy of the testing process. The analyst testified that this involves "check[ing] the chemicals," "how the instrumentation work[ed]," "what instrument was used," and "[w]hat was generated" in terms of "[t]he numbers" and "[t]he profiles." These checks exist "to ensure that when [she or another analyst] g[e]t to the ending results of all of the DNA profiles . . . that they are all correctly, exactly how they should be." She testified that this review process allows her, as DNA analyst or reporting analyst, to "take ownership of it, as if [she] was the one to physically do it [her]self."

¶23        However, the DNA analyst further testified that she did not "physically do[] the [lab] work" but instead "review[ed] all of the documentation that the[ lab team members] generate at every single one of the steps." Her work included "actually look[ing] at the DNA profiles, determin[ing] if it's suitable for comparison," "mak[ing] comparisons," and "calculat[ing] statistics." The record, therefore, is undeveloped as to (1) whether the other lab team members made any statements relating to their tasks, (2) whether—or to what extent—the testifying analyst relied on such statements in forming her own opinion, and (3) whether any such statements were testimonial.

¶24        But even assuming there was error, it would be harmless beyond a reasonable doubt. *See State v. Bocharski*, 218 Ariz. 476, ¶ 38 (2008). "In deciding whether error is harmless, the question 'is not whether, in a trial that occurred without the error, a guilty verdict would surely have been rendered, but whether the guilty verdict actually rendered in this trial was surely unattributable to the error.'" *State v. Leteve*, 237 Ariz. 516, ¶ 25 (2015) (quoting *Sullivan v. Louisiana*, 508 U.S. 275, 279 (1993)). "We must be confident beyond a reasonable doubt that the error had no influence on the jury's judgment." *Id.* (quoting *State v. Bible*, 175 Ariz. 549, 588 (1993)).

¶25        We disagree with Guevara-Enriquez's claim that the "DNA evidence was central to the convictions." M.R. provided direct testimony identifying Guevara-Enriquez as the perpetrator and describing the details of the sexual offenses. It was M.R.'s trial testimony that was central to the state's case, and the state urged the jury to convict based on her "testimony in light of [the] other evidence." *See State v. Lehr*, 201 Ariz. 509, ¶¶ 31-35 (2002) (finding error harmless where DNA evidence was corroborated by other evidence implicating defendant).

¶26        M.R.'s account was further corroborated by four witnesses. Of particular note, M.R.'s sister, who was Guevara-Enriquez's girlfriend at the time, testified that when she confronted him about the incident, he asked her, "[W]hat did I do? Did I ruin my life?" He further stated that "he

couldn't believe he was going to lose [his girlfriend and their children] because of what he did." Guevara-Enriquez also repeatedly told M.R.'s sister to "get [M.R.] checked." Shortly after being confronted, Guevara-Enriquez went to Mexico, which reflected his consciousness of guilt.

**¶27** Although the state referred to the DNA evidence during closing argument, it framed the evidence as corroborative of M.R.'s testimony and responsive to Guevara-Enriquez's third-party culpability defense. The state explicitly described it as circumstantial evidence rather than independent proof of guilt. *Contrast State v. Gomez*, 250 Ariz. 518, ¶¶ 30-31 (2021) (inconclusive DNA evidence can circumstantially establish defendant committed crime when corroborated by other evidence), *with State v. Goudeau*, 239 Ariz. 421, ¶¶ 61, 63 (2016) (DNA evidence alone can "overwhelmingly establish" defendant committed crime (quoting *United States v. Wright*, 215 F.3d 1020, 1028 (9th Cir. 2000)). The state acknowledged the complexity of DNA evidence, remarking that "DNA evidence [will never] tell us the answer, 100 percent," thereby signaling to the jury that the forensic evidence was not conclusive.

**¶28** Moreover, to the extent the DNA analyst's testimony was improper, it was as much helpful to Guevara-Enriquez as it was harmful. The DNA evidence served as the foundation for Guevara-Enriquez's third-party culpability defense. He repeatedly emphasized that there was sperm from an unknown male on M.R.'s underwear and DNA evidence from an unknown male contributor on her external genitals. He argued that this evidence does not require any credibility determinations because "DNA is what it is." Given the broader context for the DNA evidence and in light of the other properly admitted evidence, we conclude the DNA evidence did not contribute to the verdict, largely because it supported both the state's theory and Guevara-Enriquez's defense. *See Leteve*, 237 Ariz. 516, ¶ 25.

## Disposition

**¶29** We affirm Guevara-Enriquez's convictions and sentences.