98 P.3d 214

**ARIZONA STATE DEMOCRATIC PARTY, Plaintiff–Appellant,**

v.

**STATE of Arizona, Defendant–Appellee.**

**No. 1CA–CV 02–0180.**

Court of Appeals of Arizona, Division 1, Department A.

Sept. 30, 2004.

Review Granted Feb. 8, 2005.

Shughart Thomson Kilroy Goodwin Raup, P.C., By Kelly J. Flood, Rudolph J. Gerber, Marty Harper, Phoenix, Attorneys for Appellant.

Matthew J. Smith, Mohave County Attorney and Jeffrey D. Dollins, Deputy County Attorney, Kingman, Attorneys for Appellee.

**OPINION**

BARKER, Judge.

¶ 1 We address Arizona's constitutional and statutory provisions prohibiting corporations and labor unions from contributing monies for the purpose of "influencing an election." The specific question presented is whether contributions by corporations and labor unions to the Arizona Democratic Party ("the Party") to pay for the Party's operating expenses are prohibited. For the reasons that follow, we determine that these contributions are prohibited under the present Arizona statutory scheme.

**I.**

¶ 2 For some time prior to the November 1998 general election, the Party solicited and accepted donations from corporations and la-

bor unions to pay its operating expenses. At that time, the Party leased space for its headquarters. In addition to rent, the Party had ordinary business expenses such as payroll, utilities, insurance, supplies, and other overhead and administrative expenses. As a result of the solicitations, the Party received donations totaling about $100,000 from corporations and labor unions to defray these expenses.[1]

¶ 3 The Party maintained three separate checking accounts: an administrative account, a federal account, and a non-federal account. According to the Party, monies deposited into the federal account are used to support candidates in federal elections, which are covered by the Federal Election Campaign Act ("FECA"), 2 U.S.C.A. §§ 431–455 (West Supp.2004), and pertinent federal regulations. Monies deposited in the non-federal account are used indirectly to support the candidacy of the Party's candidates. Arizona election statutes govern those funds. The Party deposited all corporate donations into the administrative checking account and used funds from that account to pay for salaries, office expenses, supplies, taxes, rent, postage, insurance, computer repairs, and other overhead-related expenses. With two exceptions, the Party did not transfer money from its administrative account into either its federal or non-federal checking accounts. The exceptions occurred in September 1998 when the Party wrote two checks (totaling $6500) from the administrative account to the U.S. Postmaster to pay for part of the return postage costs that resulted from requests for the "vote at home application" for the election.

¶ 4 Shortly before the election, then-Attorney General Grant Woods learned that the Party was using corporate donations to pay

overhead and administrative expenses. Woods' office conducted an investigation, and in January 1999, then-Attorney General Janet Napolitano referred the matter to the Mohave County Attorney.

¶ 5 After the Party and the State of Arizona were unable to negotiate a complete settlement of the matter, the State entered an administrative order directing the Party to return all contributions received from corporate sources.[2] The Party voluntarily agreed to stop soliciting funds from corporations and labor unions. The Party also filed a complaint to appeal the order. The Party and the State then stipulated to relevant facts and each side moved for summary judgment.

¶ 6 The trial court denied the Party's motion and granted summary judgment in the State's favor. The court entered judgment finding that the Party violated Arizona Revised Statutes ("A.R.S.") section 16–919 (Supp.2003). It ordered the Party to deposit all improperly received contributions into the Citizens Clean Election Fund. The Party then appealed from the judgment.[3]

## II.

### A.

¶ 7 The Arizona Constitution prohibits corporations from contributing money "for the purpose of influencing any election." Ariz. Const. art. 14, § 18. It provides in full as follows:

> It shall be unlawful for any corporation, organized or doing business in this state, to make any contribution of money or anything of value *for the purpose of influencing any election* or official action.

1. The record does not disclose how many corporations or labor unions were involved or how much any one corporation or labor union contributed.

2. Though the administrative order only refers to contributions from "corporate sources" or "corporations," it is apparent that the parties have treated the order as also applying to contributions from labor unions. We do so as well.

3. A minute entry filed in the record on December 21, 2001 indicates that the judgment was entered

by the court clerk on December 19, 2001. However, no such judgment appears in the record. The Party filed its notice of appeal on January 22, 2002. The judgment was actually signed on April 30, 2002, and entered on May 2, 2002. Although the notice of appeal was premature, it took effect once the judgment was entered; accordingly, we have jurisdiction over this appeal. *See Barassi v. Matison,* 130 Ariz. 418, 421–22, 636 P.2d 1200, 1203–04 (1981); *Guinn v. Schweitzer,* 190 Ariz. 116, 117, 945 P.2d 837, 838 (App.1997).

*Id.* (emphasis added). The first issue presented to us is whether, as a matter of constitutional interpretation, monies given to a political party by a corporation for operating expenses fall within this constitutional prohibition. We note that the language of the Arizona Constitution does not refer to labor unions. Thus, we do not address the contributions from labor unions as a potential violation of this constitutional provision.

 ¶ 8 In construing the Arizona Constitution we "follow the text and the intent of the framers." *Fain Land & Cattle Co. v. Hassell,* 163 Ariz. 587, 595, 790 P.2d 242, 250 (1990). Our first step is to "examine the plain language of the provision." *Jett v. City of Tucson,* 180 Ariz. 115, 119, 882 P.2d 426, 430 (1994). "[W]hen a constitutional provision is clear on its face and is logically capable of only one interpretation," we simply follow that text. *Ward v. Stevens,* 86 Ariz. 222, 228, 344 P.2d 491, 495 (1959). When a constitutional provision is not clear, "we look to the context, effect, consequences and spirit of the law." *State v. Superior Court (Coronado),* 186 Ariz. 363, 365, 922 P.2d 927, 929 (App.1996). In particular, when faced with a constitutional phrase susceptible to multiple meanings, we look to the intent of the delegates who drafted it. *Bohannan v. Corp. Comm'n,* 82 Ariz. 299, 303, 313 P.2d 379, 381 (1957). "When constitutional questions have arisen, the court has availed itself of pertinent records of the Constitutional Convention for an insight into the effect intended from the provision in question." *Ward,* 86 Ariz. at 229, 344 P.2d at 495.

**B.**

¶ 9 As to the plain language of Article 14, Section 18, of the Arizona Constitution and in particular the phrase "influencing any election," we turn first to our own cases. Though we have addressed Article 14, Section 18 on two occasions, *Bridegroom v. State Bar,* 27 Ariz.App. 47, 48–49, 550 P.2d 1089,

1090–91 (1976); *Heiner v. City of Mesa,* 21 Ariz.App. 58, 62, 515 P.2d 355, 359 (1973), neither case construes the phrase "influencing any election." [4] We have, however, recently construed a similar phrase in a statutory setting.

¶ 10 In *Kromko v. City of Tucson,* 202 Ariz. 499, 47 P.3d 1137 (App.2002), we were required to consider the statutory phrase "influencing the outcomes of elections." The phrase is contained within A.R.S. § 9–500.14 (Supp.2003). That statute provides that a "city or town shall not use its personnel, equipment, materials, buildings or other resources for the purpose of *influencing the outcomes of elections.*" *Id.* (emphasis added). Though the direct issue in *Kromko* was whether a *communication* was for the purpose of "influencing the outcomes of elections," the court made it clear that "the statute prevents the City from using [public] *funds* to influence the outcome of an election." *Kromko,* 202 Ariz. at 503, ¶ 13, 47 P.3d at 1141 (emphasis added).

¶ 11 *Kromko* accepted and applied the principles set forth in *Buckley v. Valeo,* 424 U.S. 1, 96 S.Ct. 612, 46 L.Ed.2d 659 (1976), that communications influenced an election only when they rose to the level of "express advocacy" for a candidate or position. *Kromko* did not apply *Buckley's* precise formulation for what constituted express advocacy. *Kromko,* 202 Ariz. at 502–03, ¶ 10, 47 P.3d at 1140–41. Relying on subsequent authorities, the *Kromko* court held that communications influenced elections when the communication " 'taken as a whole[,] unambiguously urges' a person to vote in a particular manner." *Id.* (quoting *Schroeder v. Irvine City Council,* 97 Cal.App.4th 174, 118 Cal.Rptr.2d 330, 339 (2002)). Applying that holding here, monies expended for express advocacy would be for the purpose of "influencing an election"; monies that were not expended for express advocacy would not fall within that term. As the monies here were

---

4. In *Bridegroom* we held that Article 14, Section 18 did not prohibit the State Bar of Arizona from expending funds for the passage of a ballot proposition related to its duties. 27 Ariz.App. at 49, 550 P.2d at 1091 ("This constitutional provision does not prohibit the State Bar from expending money itself in the proper exercise of its author-

ized activities."). In *Heiner,* we rejected the plaintiff's claim that "the expenditure of reserve funds in a sum in excess of $14,000.00 to support the election of September 1967 in an effort to create a hospital district" was prohibited by Article 14, Section 18. 21 Ariz.App. at 62, 515 P.2d at 359.

108

for the Party's operating expenses, and not for express advocacy, the Party's position would be correct on this theory. The monies would not fall within the constitutional prohibition against "influencing any election." As we discuss in a subsequent portion of this opinion, we do not suggest that *Kromko* is controlling here. *Infra* ¶ 39. It is based on communications by a city to employees as contrasted with contributions by corporations and labor unions to a political party. But *Kromko* is illustrative of a definition of "influencing any election" that would exclude monies from the constitutional prohibition that were not used for the purpose of express advocacy.[5]

¶ 12 In addition to the construction of "influencing any election" based on the *Buckley* rationale pertaining to express advocacy, other federal authorities construe phrases like "influencing any election" in a context factually comparable to that here. FECA, passed by Congress in 1971, included several similar phrases. *See* 2 U.S.C.A. §§ 431(8)(A)(i) ("contribution" includes a gift made "for the purpose of influencing any election for Federal office"), 441a(a)(1)(A) & (a)(2)(A) (limiting contributions "with respect to any election for Federal office"), 441b(a) & (b)(2) (prohibiting certain contributions and expenditures "in connection with any election"), & 441e(a) (prohibiting contributions by foreign nationals "in connection with an election"). Congress did not define these phrases. Although the State argues that the phrase "influencing any election" unambiguously refers to *any* contribution to a political party, the Federal Elections Commission ("FEC") concluded otherwise. The FEC construed FECA, and consequently those phrases, to expressly *exclude* contributions to a political party for "party building" and get-out-the-vote drives. FEC Advisory Op.1978–10 (Aug. 29, 1978) (ht tp://hern-

don3.sdrdc.com/ao/ao/780010.html) (last visited July 2, 2004); *see also* Anthony Corrado et al., Campaign Finance Reform: A Sourcebook 172 (1997). Indeed, this interpretation (excluding contributions for expenses such as those claimed here) is described as a primary source for "soft money" that was unregulated prior to passage of the McCain–Feingold Act:[6] "The 'soft money' loophole arose as a result of a 1978 FEC advisory opinion that construed FECA's limitations on contributions to political parties as not applying to contributions for state elections, or for 'party building' purposes such as voter registration or get-out-the-vote drives." James Weinstein, *Campaign Finance Reform and the First Amendment: An Introduction*, 34 Ariz. St. L. J. 1057, 1068 (2002). A primary purpose of the recently enacted McCain–Feingold Act was to "plug" this "soft money" conduit by legislative action. *Id.* at 1071; *McConnell v. Fed. Election Comm'n*, 540 U.S. 93, ——, 124 S.Ct. 619, 654, 157 L.Ed.2d 491 (2003). Whether one agrees or not with the construction of the phrase as creating a "loophole," as opposed to recognizing legitimate First Amendment conduct, *see* James Bopp, Jr. and Richard E. Coleson, *The First Amendment Needs No Reform: Protecting Liberty from Campaign Finance "Reformers,"* 51 Cath. U.L.Rev. 785 (2002), it is clear that phrases like "influencing an election" are susceptible to more than one construction.

¶ 13 One response to any lack of clarity in the plain language of the constitution, as the State argues here, is the following pragmatic question: if the corporations here did not seek to "influence any election," "what did these corporations think they were getting in return for their donations?" After all, the facts in this case are that the express objective of the Party is to "elect all Democrats, and to strengthen the party."[7] The United

---

**5.** We recognize that *Buckley v. Valeo* and other authorities are premised in part on a distinction between contributions and expenditures. 424 U.S. at 19–21, 96 S.Ct. 612; *Fed. Election Comm'n v. Colo. Republican Fed. Campaign Comm.*, 533 U.S. 431, 469, 121 S.Ct. 2351, 150 L.Ed.2d 461 (2001) ("*Colorado Republican II*"). Using that dichotomy, *Kromko* could also be distinguished on those grounds as it was premised on communications or monies *expended*, as opposed to monies *contributed*. While recognizing

the distinction, under the facts of this particular case we decline to base our analysis of Arizona's constitutional provision upon it. *See infra* ¶ 47.

**6.** 116 Stat. 81 (2002).

**7.** This phrase is excerpted from the Party's Coordinated Campaign, which was entered into evidence in this case.

States Supreme Court has expressly recognized that donors have used "contributions to a party ... as a funnel from donors to candidates." *Colorado Republican II,* 533 U.S. at 439, 121 S.Ct. 2351. The Court noted a "manner of informal bookkeeping" known as "tallying" that would allow a candidate to receive a proportionate amount of contributions when a donor made a contribution to the party rather than the candidate. *Id.* at 459, 121 S.Ct. 2351; *see also Jacobus v. Alaska,* 338 F.3d 1095, 1099, 1115 (9th Cir. 2003) (noting the concerns about the practice of tallying and holding that Alaska's statute prohibiting contributions "for the purpose of influencing an election" included corporate contributions for administrative and operating expenses). Notwithstanding the appeal of this argument, the other cases and authorities cited above have shown that phrases similar to "influencing any election" have been construed more narrowly. Because of that, we do not believe the issue can be resolved on a constitutional basis by a plain language analysis alone.

### C.

■ ¶ 14 As noted earlier, when a constitutional passage is susceptible to multiple meanings, we consider the intention of the delegates in construing the phrase. *Bohannan,* 82 Ariz. at 303, 313 P.2d at 381. In particular, we are guided by the "pertinent records of the Constitutional Convention for an insight into the effect intended from the provision in question." *Ward,* 86 Ariz. at 229, 344 P.2d at 495.

¶ 15 In the case of Article 14, Section 18, there is historical evidence from Arizona's Constitutional Convention to assist us. In our reading of the history, and with an eye to the issue before us, we glean two principles: (1) it is plain that contributions by corporations to a *candidate's campaign fund* were the primary concern of the delegates and (2) as a subsidiary point, the broader language adopted by the delegates was to allow the legislature to implement the delegates' intent beyond this restriction.

¶ 16 At Arizona's 1910 Constitutional Convention, the predecessor to Article 14, Section 18 was discussed and approved. The RECORDS OF THE ARIZONA CONSTITUTIONAL CONVENTION OF 1910 728–731, 1161–63, 1431 (John S. Goff, ed., 1991) (*"Records"*). The provision was phrased as follows:

> It shall be unlawful for any corporation organized, or doing business in this state, *to influence elections* or official duty by contributions of money, or anything of value.

*Id.* at 1163. The key issue at the Constitutional Convention, in terms of this constitutional provision, was whether or not the phrase "or any officer thereof" would be added following the reference to corporations. *Id.* at 730–31. In debating the provision, the delegates discussed what conduct on the part of *a corporation* was intended to be precluded by reference to the phrase "to influence elections." *Id.*

■ ¶ 17 It is clear that the delegates understood by this that corporations, at a minimum, were to be precluded from contributing to *campaign funds*. Portions of the pertinent discussion are as follows: "I would hate to be deprived of the privilege of contributing to the *campaign fund.*" *Id.* at 730 (comments of Delegate Tovrea) (emphasis added). "It seems to me that this prohibits any member of a corporation from contributing money to a *campaign fund.*" *Id.* (comments of Delegate Franklin) (emphasis added). Delegate Franklin continued: *"we all very well understand* that it is one of the ordinary privileges of a corporation *to contribute money to campaign expenses* .... [I]f it is the policy of this convention to preclude corporations from contributing this money we ought to so phrase this that the officers"* would be precluded as well. *Id.* at 730–31 (emphasis added). As Delegate Cunniff put it:

> Mr. Chairman, I do not like to see corporations governing elections, but I feel that a man who may be a director of a mining company and may wish to contribute $2.60 *to a campaign fund,* should not be compelled to point to the constitution and say: "I cannot contribute this $2.60."

*Id.* at 730 (emphasis added). The delegates sought to (and did) pass a provision that precluded corporate contributions to such

campaign funds. *Id.* at 731, 1431. Franklin's proposition, that any officer should also be barred from making such contributions, failed. *Id.* at 731. One thing was made clear—"influencing any election" certainly includes corporate contributions to campaign funds.

¶ 18 A subsidiary point, not as firmly established as the reference to campaign funds or expenses but still present, is the use of broader language to allow the legislature to effect the delegates' purpose. For instance, the constitutional language is not phrased to simply make it "unlawful ... to make any contribution of money" to a candidate's campaign fund. The language is broader: it is "unlawful ... to make any contribution of money ... for the purpose of influencing any election." Ariz. Const. art. 14, § 18. Hearkening back to the same discussion on corporate officers, Delegate Parsons stated:

> Mr. Chairman, as I understand now the object of the gentleman from Maricopa [Franklin] is that he wants the corporation to be precluded from contributing, but is willing that individual members or officers of the corporation may in their own individual capacity contribute. Then I think the section is properly stated as it is, for the corporation can only contribute by some of its officers, and *if a corporation is denied the right to contribute then I think we have said all we can say with reference to them.* Any officer may have the right to contribute in his own capacity. *It seems to me that all we can do is to get down the principle and leave the details to be worked out by the legislature.*

*Id.* at 730 (emphasis added).[8] Delegate Parsons' position was the position that prevailed. The statement, "all we can do is to get down the principle and leave the details to be worked out by the legislature," indicates the preference of having more specific prohibitions (beyond direct contributions to campaign funds) established through legislative means, not through constitutional interpretation.

■■■ ¶ 19 Delegate Parsons' comments in this regard are reinforced by the separa-

tion of powers doctrine and the influence that a court's decision on *constitutional* grounds, as opposed to *statutory* grounds, has upon the people. "To ensure separation of the powers of government under the U.S. Constitution, federal courts have consistently established doctrines 'founded in concern about the proper—and properly limited—role of the courts in a democratic society.'" *Bennett v. Napolitano*, 206 Ariz. 520, 524–25, ¶ 17, 81 P.3d 311, 315–16 (2003) (quoting *Allen v. Wright*, 468 U.S. 737, 750, 104 S.Ct. 3315, 82 L.Ed.2d 556 (1984)). Those same principles of separation of powers that apply to the United States Constitution also apply under Arizona's constitution. *Id.* at 525, ¶ 19, 81 P.3d at 316; *see also* Ariz. Const. art. 3. When the courts make a decision on constitutional grounds, they necessarily limit the legislature from rejecting that interpretation. The courts effectively preclude the people's ability to act through their elected representatives. *See Elk Grove Unified Sch. Dist. v. Newdow*, 542 U.S. ——, ——, 124 S.Ct. 2301, 2320, 159 L.Ed.2d 98 (2004) (Rehnquist, C.J., concurring) ("When courts extend constitutional prohibitions beyond their previously recognized limit, they may restrict democratic choices made by public bodies."). Thus, we wield this significant power sparingly.

### D.

■■■ ¶ 20 The phrase "influencing any election" can be reasonably construed in differing ways. Because of this, the express statements of the delegates showing the primary concern at the Constitutional Convention to be campaign contributions, and the consideration based on separation of powers, we decline to construe Article 14, Section 18 to necessarily apply to monies contributed to political parties for operating expenses. Rather, we believe the better course is to look to the legislature to see if they have statutorily prohibited such contributions. In doing so, however, we wish to make clear that we do not hold that Article 14, Section 18 is *only* limited to funds contributed to a candidate's campaign fund. Rather, we decide on the narrow issue before us that mo-

---

**8.** Franklin clarified the intent of his proposal to the effect that officers could *not* contribute in their individual capacity. *Records* at 730. This motion failed. *Id.* at 731.

nies contributed by corporations to political parties for operating expenses are not *necessarily* prohibited by this constitutional provision. We turn now to the statutory scheme.

## III.

### A.

¶ 21 The Arizona legislature enacted a statutory provision to implement Article 14, Section 18, of the Arizona Constitution. A.R.S. § 16–919(A). That provision, utilizing the language of the constitution, provides: "It is unlawful for a corporation or a limited liability company to make any contribution of money or anything of value for the purpose of influencing an election." [9] *Id.* The legislature passed a similar section pertaining to labor unions. A.R.S. § 16–919(B) ("It is unlawful for a labor organization to make any contribution of money or anything of value for the purpose of influencing an election."). Though the legislature defined a number of operative terms within the statute, e.g., "election," "employee," "employer," and "labor organization," A.R.S. § 16–919(F), the legislature did not define what it meant by "influencing an election."

 ¶ 22 We construe a statute in the same manner we construe a provision of the constitution; we consider first the language of the statute. *Scottsdale Healthcare, Inc. v. Ariz. Health Care Cost Containment Sys. Admin.*, 206 Ariz. 1, 5, ¶ 10, 75 P.3d 91, 95 (2003). If the statute is not plain on its face, we then consider the statutory language in conjunction with the same broad range of pertinent factors. *Logan v. Forever Living Prods. Int'l, Inc.*, 203 Ariz. 191, 194, ¶ 10, 52 P.3d 760, 763 (2002) ("In discerning legislative intent, we look to the statute's policy, the evil it was designed to address, its words,

context, subject matter, and effects and consequences.").

¶ 23 For the same reasons we gave in considering Arizona's constitutional passage, *supra*, ¶¶ 9–13, we consider the phrase "influencing an election" in the statutory enactment to be susceptible to multiple meanings.[10] Accordingly, we turn directly to the broader range of factors for our analysis.

### B.

¶ 24 If possible, "we adopt a construction of a statute that reconciles it with other statutes, giving force to all statutes involved." *Lewis v. Ariz. Dep't of Econ. Sec.*, 186 Ariz. 610, 614, 925 P.2d 751, 755 (App. 1996). Our interpretation should be the one "most harmonious with the statutory scheme and legislative purpose." *State v. Pinto*, 179 Ariz. 593, 596, 880 P.2d 1139, 1142 (App. 1994). Our constructions should "make practical sense." *State v. Cornish*, 192 Ariz. 533, 537, ¶ 16, 968 P.2d 606, 610 (App.1998).

¶ 25 We do not suggest that there is only one means of construing the statutory bar against corporate and labor contributions "for the purpose of influencing an election" that is set forth in § 16–919(A) and (B). As the dissent points out, one way of reading the statute is to conclude that the listing of individuals in § 16–919(A) who may *not* receive contributions, and the failure to include political parties or their representatives on the list, indicates an intent to only treat contributions to those listed persons as being prohibited. This was not an argument raised either below or on appeal. The parties may not have raised this argument because the same listing of individuals pertaining to accepting corporate contributions in § 16–919(A) was

---

9. That section provides in full as follows:

 A. It is unlawful for a corporation or a limited liability company to make any contribution of money or anything of value for the purpose of influencing an election, and it is unlawful for the designating individual who formed an exploratory committee, an exploratory committee, a candidate or a candidate's campaign committee to accept any contribution of money or anything of value from a corporation or a limited liability company for the purpose of influencing an election. This subsection does

not apply to political committees that are incorporated pursuant to title 10, chapters 24 through 40 and political committees that are organized as limited liability companies. A.R.S. § 16–919(A).

10. The constitutional phrase is "influencing *any* election." Ariz. Const. art. 14, § 18 (emphasis added). The statutory phrase is "influencing *an* election." A.R.S. § 16–919(A) (emphasis added). We find no distinction based on the use of "any" as contrasted with "an."

*not* included with regard to the labor contributions identified in § 16–919(B). Thus, the dissent's interpretation would only apply to corporate and not labor contributions.[11] When considering the plain language of § 16–919(A) & (B) and viewing Arizona's statutory scheme for campaign finance as a whole, as we must, it seems plain to us that the legislature did not intend to permit corporations and labor unions to circumvent the statutory prohibition against "influencing any election" by allowing contributions to political parties for "operating expenses." Such an exclusion was *not* called out in the statute by the legislature. Our analysis is as follows.

¶ 26 Though barring all contributions by corporate and labor sources "for the purpose of influencing an election," A.R.S. § 16–919(A) & (B), the legislature specifically provided that the prohibition on corporations "does not apply to political committees" formed as nonprofit corporations. A.R.S. § 16–919(A). The statutory scheme then defines a political committee to include a "separate, segregated fund established by a corporation or labor organization" pursuant to A.R.S. § 16–920(A)(3). A.R.S. § 16–901(19)(b) (Supp.2003).

¶ 27 Section 16–920(A)(3), in turn, provides that corporations and labor organizations may provide for "[t]he establishment, administration and solicitation of voluntary contributions to a separate segregated fund to be *utilized for political purposes.*" (Emphasis added.) And while a corporation or union may establish, administer, and solicit contributions for the fund, the funding is to come solely from voluntary contributions from a corporation's "stockholders and their families and its executive or administrative personnel and their families" or a union's members and

their families. A.R.S. § 16–921(B) & (G) (1996). The money may come from no other "person," *id.*, which includes the corporation or union. A.R.S. § 1–215(29) (the term "person" includes corporations or associations). Thus, the setting for what constitutes "influencing an election" is that corporations and labor unions may financially participate, "for political purposes," by means of this separate segregated fund. A.R.S. § 16–920(A)(3). That these are the funds "to be utilized for political purposes" strongly suggests to us that treasury monies were not to be so used, except when limiting them would be constitutionally impermissible.

¶ 28 Other portions of the statutory scheme bear this out. Section 16–920(A)(2) allows corporations and labor organizations to expend monies for "*[n]on-partisan* registration and get-out-the-vote campaigns by a corporation aimed at *its stockholders and executive or administrative personnel and their families* or by a labor organization aimed at its members and their families." (Emphasis added.) We do not consider it inconsequential that the permissible political activity that is specified is both "non-partisan" and limited to "stockholders," "executive or administrative personnel," "members," and "their families." *Id.*

¶ 29 When construing statutes we consider that "the expression of one or more items of a class indicates an intent to exclude all items of the same class which are not expressed." *Pima County v. Heinfeld,* 134 Ariz. 133, 134, 654 P.2d 281, 282 (1982); *see also PAM Transp. v. Freightliner Corp.,* 182 Ariz. 132, 133, 893 P.2d 1295, 1296 (1995) ("[I]f a statute specifies under what conditions it is effective, we can ordinarily infer

---

11. Additionally, on the plain language of § 16–919(A), there are separate violations for (1) those who *"make* any contribution" for the purpose of influencing an election and (2) those who *"accept* any contribution" for purposes of influencing an election. Identifying those who may have criminal liability for *accepting* a contribution does not define the scope of what is for the purpose of influencing an election for those who make contributions nor does it limit who may be accountable for *making* such contributions. This is essentially what the dissent argues, *infra* ¶ 58, in asserting there is an absurd result. We respectfully disagree.

The dissent also argues that the definition of election in § 16–919(F), referencing specific elections, means that § 16–919(A) and (B) "only prohibit corporate contributions for the purpose of influencing elections of individuals for enumerated political positions." *Infra* ¶ 56. The "election of individuals" for the enumerated positions, is exactly what these contributions are about. The contributions at issue are for operating expenses for the Democratic party whose express purpose, on the record before us, is to "elect all Democrats" in the elections to which § 16–919(F) refers.

that it excludes all others.”). The statutes allow labor organizations and corporations to spend money on non-partisan activities aimed at their own members, stockholders, and families. Monies contributed to the Party are by their very definition partisan and not limited to shareholders, members, or their families. To permit such contributions would be directly contrary to the statutory principles just stated.

¶ 30 Section 16–920(A)(5) broadens the scope of permissible political contributions by allowing for “[c]ontributions for use to support or oppose an initiative or referendum measure or amendment to the constitution.” The statute appears to be a direct response to United States Supreme Court cases which preclude states from prohibiting corporations from supporting *non-candidate* elections. *See First Nat'l Bank of Boston v. Bellotti,* 435 U.S. 765, 98 S.Ct. 1407, 55 L.Ed.2d 707 (1978) (striking down a Massachusetts law prohibiting corporate contributions or expenditures with regard to referenda); *but cf. Fed. Election Comm'n v. Nat'l Right to Work Comm.,* 459 U.S. 197, 103 S.Ct. 552, 74 L.Ed.2d 364 (1982) (upholding FECA's provisions prohibiting corporations and labor unions from using treasury funds in candidate elections). This statutory provision is consistent with our view of the legislative intent that contributions “for political purposes by a corporation [or] labor organization” be limited to those from “a separate segregated fund” based on voluntary contributions rather than the use of treasury monies. *See* A.R.S. § 16–920(A)(3). Such a reading is consistent with Arizona's constitutional provision in that the legislature has provided the “details” (beyond a prohibition on contributing to a candidate's campaign fund) necessary to implement a directive that corporations not influence elections through their corporate wealth.

¶ 31 We note, too, that the language of section 16–920(A) describes the contributions it permits as “*political* contributions.” (Emphasis added.) That section directs that monies “utilized for *political purposes* by a corporation [or] labor organization” come only from voluntary contributions, not the corporation's treasury. A.R.S. §§ 16–920(A)(3)

& –921(B) (emphasis added). This also tells us that the scope of corporate and labor contributions that “influences an election” was intended to cover specifically includes monies clearly expended for “political purposes.” For whatever else a political party may do or be, one thing is certain: a political party is at the heart and core of the “political purposes” to which the legislation is expressly directed. *See Buckley,* 424 U.S. at 39, 96 S.Ct. 612. We need not decide whether a party and a candidate are “joined at the hip.” *Colorado Republican II,* 533 U.S. at 448–49, 121 S.Ct. 2351. It seems clear to us that a political party is the very type of entity that the legislature had in mind when it provided that corporations and labor organizations must use a separate mechanism to make contributions for “political purposes.”

### C.

¶ 32 The Party argues, however, that the separate definition of “contribution” in A.R.S. § 16–901(5), which applies generally to the campaign finance scheme as a whole, permits the contributions at issue here. We do not find this argument persuasive.

¶ 33 As an initial matter, it is unclear to us that the general definition of “contribution” applies in the present context. Section 16–901(5) provides in pertinent part the following definition:

> In this chapter, unless the context otherwise requires:
>
> . . . .
>
> 5. “Contribution” means any gift, subscription, loan, advance or deposit of money or anything of value made for the purpose of influencing an election . . . .

A.R.S. § 16–901(5). We note that the definition is to be applied “unless the context otherwise requires.” In making that determination, we consider that “[s]tatutes are to be given, whenever possible, such an effect that no clause, sentence or word is rendered superfluous, void, contradictory or insignificant.” *State v. Deddens,* 112 Ariz. 425, 429, 542 P.2d 1124, 1128 (1975).

¶ 34 The definition of contribution in A.R.S. § 16–901(5) is defined in part by use of the phrase "for the purpose of influencing an election." This phrase is already included within the prohibition against corporate and labor contributions at issue here. A.R.S. § 16–919(A) & (B). If we inserted the definition from A.R.S. § 16–901(5) into A.R.S. § 16–919(A) & (B), the phrase from one section or the other becomes superfluous. Therefore, it is not clear to us that the general definition of contribution applies to A.R.S. § 16–919(A) & (B). This is particularly so given the presence of A.R.S. § 16–920 which, as described, defines contributions and expenditures in a setting for corporations and labor organizations. Though not controlling, the heading to § 16–920 is indicative of this as well. The heading states: "Permitted expenditures by corporations and labor organizations."

¶ 35 Notwithstanding the foregoing, even if the general definition of contribution applies, we do not find that it advances the Party's position. The passage from § 16–901(5) upon which the Party primarily relies is the exemption for "payment *by* a political party for operating expenses." A.R.S. § 16–901(5)(b)(v) (emphasis added).[12] The Party argues that since payments *by* a political party for operating expenses are not contributions, monies contributed *to* a political party for operating expenses should not be either. We disagree.

¶ 36 In the first place, when language is clear and unambiguous we are to follow it unless an absurdity would result. *Bilke v. State*, 206 Ariz. 462, 464, ¶ 11, 80 P.3d 269, 271 (2003). The statutory words and phrases must be given their ordinary meanings unless the context indicates otherwise. *Cochise County v. Ariz. Health Care Cost Containment Sys.*, 170 Ariz. 443, 445, 825 P.2d 968, 970 (App.1991). "By," quite simply, does not

mean "to." The statute provides for the exclusion of payments *by* a political party, not monies contributed *to* a political party. The Party's reading converts the statutory phrase "the payment *by* a political party" to the phrase "the payment *to* a political party." The obvious effect of such a reading is to exempt monies that are given by entities other than a political party whereas the statute's terms would only exempt the political party itself. These are substantially different concepts.

¶ 37 Courts may not "inflate, expand, stretch or extend a statute to matters not falling within its expressed provisions." *City of Phoenix v. Donofrio*, 99 Ariz. 130, 133, 407 P.2d 91, 93 (1965). Nor may we "read into a statute something which is not within the manifest intention of the legislature as gathered from the statute itself." *State ex rel. Morrison v. Anway*, 87 Ariz. 206, 209, 349 P.2d 774, 776 (1960). Changing "by" to "to" makes a change in the substantive terms of the statute which we are not authorized to do.

¶ 38 Second, even if we consider the Party's argument solely to be that § 16–901(5)(b)(v) is descriptive of monies that should be excluded, rather than a limitation, we would reject it. As mentioned earlier, including "one or more items of a class indicates an intent to exclude all items of the same class which are not expressed." *Heinfeld*, 134 Ariz. at 134, 654 P.2d at 282. Here, payments by a *political party* were excluded. There was a reason under the statute to do this. Arizona's statutory scheme places limits on the amount of money that a political party can contribute to its nominees. A.R.S. § 16–905(D) (Supp.2003). Section 16–901(5)(b)(v) makes it clear that the funds a political party spends for its operating expenses (as well as the other items listed in that subsection such as voter registration) do

---

**12.** The full text of A.R.S. § 16–901(5)(b)(v) provides that the term "contribution" does not include

(v) The payment by a political party for party operating expenses, party staff and personnel, party newsletters and reports, voter registration and efforts to increase voter turnout, party organization building and maintenance and printing and postage expenses for slate cards,

sample ballots, other written materials that substantially promote three or more nominees of the party for public office and other election activities not related to a specific candidate, except that this item does not apply to costs incurred with respect to a display of the listing of candidates made on telecommunications systems or in newspapers, magazines or similar types of general circulation advertising.

not count against these contribution limits. Using the principle that including one member of a class excludes others not mentioned means that "payments by *a political party*" should not be amended by us to allow "payments by a *corporation*" or "payments by a *labor organization.*" Thus, we do not believe the Party's argument with regard to the exemption for operating expenses paid "by a political party" reflects either the language of the statute or the legislature's intent.

¶ 39 The Party also argues that the *Kromko* case reflects the definition of "influencing an election" that we should apply in this setting. *See Kromko,* 202 Ariz. at 502–03, ¶ 10, 47 P.3d at 1140–41. Again, we disagree. *Kromko,* as described above, is illustrative of the different meanings that can be given to phrases like "influencing an election." We cite it for that purpose in our discussion of constitutional issues because it demonstrates the need to go beyond the plain language of the constitution (as well as the statutory language) to discern its meaning. Though we certainly consider the factors from *Kromko,* our task when construing the statute at issue here is primarily one of discerning the legislative intent with regard to that particular statute. *Kromko* construed a statute prohibiting cities from sending communications intended to influence an election. *Id.* at 501, ¶ 6, 47 P.3d at 1139. *Kromko* set forth a standard to make that determination in that setting with which we have no quarrel. Here, however, we deal with a different statute in a different factual setting. The question, in the context of Arizona's statutory campaign finance scheme, is whether the legislature intended that contributions made to political parties by corporations and labor organizations for operating expenses are to be considered as having been made for the purpose of influencing an election. In *Kromko,* there is no issue at all about whether a *contribution to a political party* is for the purpose of influencing an election; instead the issue was whether *a communication sent by a city* is for that purpose. The considerations are completely different. As discussed above, the provisions in the statutory scheme lead us to conclude that the legislature intended to preclude corporations and labor unions from utilizing treasury monies for such contributions. Rather, the legislature intended that such contributions be from voluntary sources through means of a separate segregated fund. The principles from *Kromko* (and the cases upon which it relies) do not persuade us that the legislature intended otherwise.

**D.**

¶ 40 For the reasons set forth above, we conclude that the Arizona statutory scheme prohibits contributions by corporations and labor unions from treasury monies to political parties for operating expenses. Having so concluded, we must now address whether such a provision is constitutional under both the United States Constitution and the Arizona Constitution.

**IV.**

¶ 41 Though we typically address Arizona constitutional issues before taking up issues under the United States Constitution, *Mountain States Tel. & Tel. Co. v. Ariz. Corp. Comm'n,* 160 Ariz. 350, 356, 773 P.2d 455, 461 (1989), we reverse the order here. The reason we do is the extensively developed case law under the United States Constitution on this issue. Though dealing with significant First Amendment rights, our analysis of the issues under the United States Constitution is, in our view, simple, straightforward, and compelled by those decisions.

¶ 42 The Court has directed that contributions and expenditures are subject to different levels of scrutiny for purposes of First Amendment analysis. This distinction has been present in United States constitutional jurisprudence since the landmark decision in *Buckley,* 424 U.S. at 20–21, 39, 96 S.Ct. 612. For contributions there is a "lesser demand of being 'closely drawn' to match a 'sufficiently important interest.'" *Fed. Election Comm'n v. Beaumont,* 539 U.S. 146, 162, 123 S.Ct. 2200, 156 L.Ed.2d 179 (2003) (quoting *Nixon v. Shrink Mo. Gov't PAC,* 528 U.S. 377, 387–88, 120 S.Ct. 897, 145 L.Ed.2d 886 (2000)). This standard is contrasted with the more exacting scrutiny required of expenditures, requiring such limits to be "narrowly tailored to serve a compel-

ling governmental interest." *Id.* Though the Court has recognized that "[o]ur application of this less rigorous degree of scrutiny has given rise to significant criticism," it has been consistently and recently reinforced. *McConnell,* 540 U.S. at ——, 124 S.Ct. at 657 (2003).

¶ 43 Just as importantly, under federal constitutional jurisprudence it is also clear that when the limitation is being placed on contributions from corporations or labor unions, the level of scrutiny declines even further. Again from *Beaumont:*

> Within the realm of contributions generally, corporate contributions are furthest from the core of political expression, since corporations' First Amendment speech and association interests are derived largely from those of their members and of the public in receiving information. A ban on direct corporate contributions leaves individual members of corporations free to make their own contributions, and deprives the public of little or no material information.

539 U.S. at 161 n. 8, 123 S.Ct. 2200 (emphasis added). Thus, the Court has made it clear that while corporations have associational and speech rights under the First Amendment, corporate contributions are not entitled to strict scrutiny and those rights are "furthest from the core of political expression." *Id.*

¶ 44 Against this backdrop of more exacting scrutiny for expenditures than contributions, the United States Supreme Court has upheld a Michigan ban prohibiting independent *expenditures* by corporations and labor unions from treasury monies. *Austin v. Mich. Chamber of Commerce,* 494 U.S. 652, 110 S.Ct. 1391, 108 L.Ed.2d 652 (1990). There, the Court held that the "danger of real or apparent corruption," when combined with "the unique state-conferred corporate structure that facilitates the amassing of large treasuries" warranted the limit on independent expenditures. *Id.* at 659–60, 110 S.Ct. 1391. Having found a compelling interest, the *Austin* Court then determined that the complete ban was narrowly tailored because it allowed corporations to make independent expenditures through separate seg-

regated funds. *Id.* at 660–61, 110 S.Ct. 1391. In doing so, it noted that the rationale applied to "corporations and labor unions without great financial resources, as well as those more fortunately situated" based on "Congress' judgment that it is the *potential* for such influence that demands regulation." *Id.* at 661, 110 S.Ct. 1391 (quoting *Nat'l Right to Work Comm.,* 459 U.S. at 209–210, 103 S.Ct. 552).

¶ 45 Applying *Austin* to this case results in the following: if a ban on *expenditures* by corporations is constitutional when the ability to use a separate segregated fund is allowed, a ban on *contributions* under the same circumstances must be constitutional as well. Otherwise, it would be inescapably inconsistent with *Austin* to hold that such a ban on contributions would be unconstitutional (with a lesser level of scrutiny) when in *Austin* a ban on expenditures (with "exacting scrutiny") was determined to be constitutional. This is the logic that the Ninth Circuit followed in dealing with a similar circumstance. *Jacobus,* 338 F.3d 1095. Dealing with a ban on soft money contributions by corporations and labor unions in an Alaska statute, the *Jacobus* court held: "Despite the broad sweep of the ban on corporate expenditures in *Austin,* the Court found the ban to be justified, suggesting that a ban on corporate contributions is almost certainly also constitutional." *Id.* at 1121–22. We note further that the Alaska statute banning corporate and labor contributions was founded upon the same "influencing an election" language as is found in the Arizona statute. *Id.* at 1100 n. 10.

¶ 46 Thus, under our present jurisprudence, the First Amendment does not infringe upon the Arizona legislature's ability to completely ban corporate and labor contributions to political parties whether designated for operating expenses or not. We now turn to the issues under the Arizona Constitution.

**V.**

¶ 47 We have already held that Article 14, Section 18, of the Arizona Constitution does not *require* that contributions by corpo-

rations to political parties be banned. The question now is whether Arizona's constitutional right to "freely speak" *permits* legislation that does so. When read in conjunction with Article 14, Section 18, we determine that it does.

■ Article 2, Section 6, of the Arizona Constitution provides:

> Every person may freely speak, write, and , publish on all subjects, being responsible for the abuse of that right.

Our courts have described Article 2, Section 6, as providing greater protection of expressive rights than the First Amendment. *Mountain States,* 160 Ariz. at 354–55, 773 P.2d at 459–60 ("[T]his court has previously given art. 2, § 6 greater scope than the first amendment."); *Martin v. Reinstein,* 195 Ariz. 293, 321, ¶ 103, 987 P.2d 779, 807 (App. 1999) ("[T]he Arizona Constitution does in some circumstances provide greater protection of speech than does the federal constitution."). Our supreme court has invalidated governmental action based on the *"more stringent protections* of the Arizona Constitution." *Mountain States,* 160 Ariz. at 358, 773 P.2d at 463 (emphasis added).[13] Under such circumstances, we are hesitant to apply the reduced standard of protection for contributions as contrasted with expenditures. *Supra* ¶¶ 42–46. There is substantial merit to the argument that "contributions and expenditures are two sides of the same First Amendment coin." *Buckley,* 424 U.S. at 241, 96 S.Ct. 612 (Burger, C.J., concurring in part and dissenting in part). In the "operating expenses" setting before us, we see no principled distinction between a corporation *contributing* monies so that the Party can pay its operating expenses such as rent (a contribution) as opposed to a corporation *expending* monies by either directly paying the expense by sending a rent payment to the landlord or providing a corporate-owned office without charging rent (an expenditure). We are not alone in failing to see this distinction. *See, e.g., Shrink Mo.,* 528 U.S. at 410, 120 S.Ct. 897 (Thomas, J., dissenting) ("[O]ur decision in *Buckley* was in error. . . . I would subject campaign contribution limitations to strict scrutiny. . . ."); *Colo. Republican Fed. Campaign Comm. v. Fed. Election Comm'n,* 518 U.S. 604, 636, 116 S.Ct. 2309, 135 L.Ed.2d 795 (1996) (Thomas, J., concurring in judgment and dissenting in part) ("In my view, the distinction lacks constitutional significance, and I would not adhere to it."); *Fed. Election Comm'n v. Nat'l Conservative Political Action Comm.,* 470 U.S. 480, 519, 105 S.Ct. 1459, 84 L.Ed.2d 455 (1985) (Marshall, J., dissenting) ("Although I joined the portion of the *Buckley per curiam* that distinguished contributions from independent expenditures for First Amendment purposes, I now believe that the distinction has no constitutional significance."); *Buckley,* 424 U.S. at 261, 96 S.Ct. 612 (White, J., concurring in part and dissenting in part) ("For constitutional purposes it is difficult to see the difference between" regulation of expenditures and contributions); *id.* at 290, 96 S.Ct. 612 (Blackmun, J., concurring in part and dissenting in part) ("I am not persuaded that the Court makes, or indeed is able to make, a principled constitutional distinction between the contribution limitations, on the one hand, and the expenditure limitations, on the other, that are involved here."). We need not, however, resolve this issue as a matter of state constitutional law.

**13.** Some of our decisions contain language to the effect that the "greater protection ... lies in the Arizona Constitution's extension of free speech rights to cover not only speech limitations imposed by the government, but also speech limitations emanating from other sources." *State v. Evenson,* 201 Ariz. 209, 218, ¶ 33 n. 15, 33 P.3d 780, 789 n. 15 (App.2001); *see also State ex rel. Napolitano v. Gravano,* 204 Ariz. 106, 115, ¶ 34 n. 7, 60 P.3d 246, 255 n. 7 (App.2002). Our reading of *Mountain States* does not lead to this conclusion. The *Mountain States* court stated that, while the First Amendment "provides only a protection against government action," the Arizona Constitution "directly grant[s] every Arizonan a broad free speech right." *Mountain States,* 160 Ariz. at 354, 773 P.2d at 459. It then went on to detail instances in which the Arizona Supreme Court had held that the Arizona Constitution provides greater protection for free speech against *governmental* action. *Id.* at 354–55, 773 P.2d at 459–60. The court then proceeded to invalidate a Corporation Commission order (a governmental action) under the "more stringent protections of the Arizona Constitution." *Id.* at 358, 773 P.2d at 463. Thus, the greater protection of the Arizona Constitution is not limited merely to non-state action.

¶ 48 Our analysis under the Arizona Constitution proceeds on a different foundation from the analysis under the United States Constitution. Unlike the federal constitution, Arizona's constitution expressly prohibits corporations from "influencing any election." Ariz. Const. art. 14, § 18. Whereas federal decisions need only consider First Amendment rights when determining whether corporate contributions or expenditures can be limited, we must also consider the express limitation that Arizona's constitution places on corporate contributions "for the purpose of influencing any election." *Id.* When construing Arizona's constitution, we must consider all of its terms, not simply the right to "freely speak." *Kilpatrick v. Superior Court*, 105 Ariz. 413, 419, 466 P.2d 18, 24 (1970) ("[C]onstitutions must be construed as a whole and their various parts must be read together.").

¶ 49 It is apparent to us that, in adopting a constitutional provision that prohibits corporations from making any contributions for the purpose of influencing an election, the delegates were aware that certain core rights of political expression would not only be limited, but completely barred. This was a deliberate decision, expressly sanctioned in Arizona's constitution, that the delegates intended to bring about. As discussed above, while we have construed that constitutional provision to not *necessarily* preclude all contributions to political parties, we do not find it outside the scope of the constitutional power granted to the legislature. Clearly, contributions to political parties can be considered for the purpose of influencing an election. As noted earlier, the record shows the express purpose of the Party is "to elect all Democrats."

¶ 50 Our mandate is to, "[i]f possible, ... construe[ ] statutes to avoid rendering them unconstitutional." *Hayes v. Cont'l Ins. Co.*, 178 Ariz. 264, 272, 872 P.2d 668, 676 (1994). By providing a means for corporations and labor organizations to participate through separate segregated funds, the legislature has authorized a method for corporations and labor organizations to participate in effecting "political purposes" that is consistent with the mandate against "influencing

any election" under Article 14, Section 18. Because of the presence of Article 14, Section 18, we do not find the ban on corporate and labor contributions to political parties to be in violation of Arizona's right to "freely speak."

## VI.

¶ 51 The Party also argues that A.R.S. § 16–919(A), and consequently Article 14, Section 18, are unconstitutionally overbroad because they do not exclude nonprofit corporations from their reach. This issue is not presented to us on the facts.

¶ 52 We recognize, as the United States Supreme Court has held, that nonprofit corporations may provide the most effective means "by which large numbers of individuals of modest means can join together in organizations which serve to 'amplif[y] the voice of their adherents.'" *Nat'l Conservative Political Action Comm.*, 470 U.S. at 494, 105 S.Ct. 1459 (quoting *Buckley*, 424 U.S. at 22, 96 S.Ct. 612). We also recognize the Court's view that some nonprofit corporations are "more akin to voluntary political associations than business firms." *Fed. Election Comm'n v. Mass. Citizens For Life, Inc.*, 479 U.S. 238, 263, 107 S.Ct. 616, 93 L.Ed.2d 539 (1986). Our holding here is in complete harmony with those cases as applied to the federal constitution and Arizona's right to "freely speak." There is no showing in the record of any nonprofit corporation that made contributions. Thus, the Party cannot prevail on these grounds.

## VII.

¶ 53 To conclude, we hold that Article 14, Section 18 of the Arizona Constitution does not necessarily preclude corporations from contributing to a political party's operating expenses. We also hold, however, that the Arizona legislature banned corporate and labor contributions to political parties for operating expenses when it enacted A.R.S. § 16–919(A) & (B) and the related statutory scheme. We further hold that those statutory enactments comply with the First Amendment to the United States Constitution and the Arizona Constitution. Accordingly, and

for the reasons set forth above, the judgment of the trial court is affirmed.

CONCURRING: WILLIAM F. GARBARINO, Judge.

TIMMER, Judge, dissenting.

¶ 54 I respectfully dissent. After applying accepted principles of statutory construction to A.R.S. § 16–919(A) and (B), I conclude that a corporation, limited liability company, or labor organization [14] violates these provisions only when making contributions to prospective candidates, candidates, or their campaign representatives for the purpose of influencing elections involving those candidates. Because the corporate contributions to the Party at issue in this case were not made for this prohibited purpose, I would reverse the summary judgment and remand to the trial court with directions to enter judgment in favor of the Party.

¶ 55 Both the Majority and I agree that the pivotal language in § 16–919(A) and (B) is the phrase that prohibits corporations from contributing money or anything of value "for the purpose of influencing an election." I part ways with my colleagues, however, when they label this phrase ambiguous, *see supra*, ¶ 23, and proceed to employ secondary principles of statutory construction, *see supra*, ¶¶ 24–40, without first considering the meaning of the phrase within the context of the entire statute. *Calmat of Arizona v. State ex rel. Miller*, 176 Ariz. 190, 193, 859 P.2d 1323, 1326 (1993) (concluding that to determine legislative intent court must first review statute's language); *State v. Williams*, 175 Ariz. 98, 100, 854 P.2d 131, 133 (1993) (holding that statute's language is best and most reliable guide of its meaning). When the entirety of § 16–919 is examined, the phrase "influencing an election" must be given a narrower construction than the one offered by the Majority. *See supra* ¶ 31.

¶ 56 For purposes of § 16–919(A) and (B), the term "election" is defined as follows:

"Election" means any election to any political office, any election to any political convention or caucus, or any primary election held for the purpose of selecting any candidate, political committee or other person for any political office, convention or caucus.

A.R.S. § 16–919(F)(1). Employing this definition, § 16–919(A) and (B) only prohibit corporate contributions for the purpose of influencing elections of individuals for enumerated political positions. The provision neither proscribes corporate contributions made to influence elections for any initiative, referendum, or other measure or proposition [15] nor prohibits other political contributions not made for the purpose of influencing elections of individuals. The Majority therefore errs by interpreting § 16–919(A) and (B) as broadly prohibiting all corporate contributions made for "political purposes." *See supra* ¶ 31.

¶ 57 This conclusion is further supported by examining the identity of the parties who cannot lawfully receive corporate contributions made "for the purpose of influencing an election." After prohibiting such corporate contributions, § 16–919(A) continues, in relevant part, as follows:

. . . and it is unlawful for the designating individual who formed an exploratory committee, an exploratory committee, a candidate or a candidate's campaign committee to accept any contribution of money or anything of value from a corporation or a limited liability company for the purpose of influencing an election."

Thus, only prospective candidates, candidates, and their campaign representatives are prohibited from receiving proscribed corporate contributions. Section 16–919(A) does not prohibit individuals and entities that are not associated with an individual's campaign from accepting corporate contributions. The only logical reason for so limiting the list of

14. For ease of reference, and because § 16–919 does not significantly distinguish its treatment of corporations, limited liability companies, and labor organizations, I hereafter collectively refer to the entities as "corporations" unless otherwise specified.

15. Indeed, the legislature explicitly approves this construction by providing in A.R.S. § 16–920(A)(5) that "[c]ontributions for use to support or oppose an initiative or referendum measure or amendment to the constitution" shall not be construed as prohibited political contributions.

prohibited recipients is that the legislature only intended to prohibit corporate contributions made to influence elections to individual political positions.[16] *See Westburne Supply, Inc. v. Diversified Design and Const., Inc.,* 170 Ariz. 598, 600, 826 P.2d 1224, 1226 (App. 1992) ("What a statute necessarily implies is as much a part of the statute as what it makes explicit.").

¶ 58 Additionally, if the Majority is correct, application of § 16–919(A) and (B) would produce absurd results. *City of Phoenix v. Superior Court,* 139 Ariz. 175, 178, 677 P.2d 1283, 1286 (1984) (concluding court should interpret statute to give it fair and sensible meaning); *State v. Medrano–Barraza,* 190 Ariz. 472, 474, 949 P.2d 561, 563 (App.1997) ("We presume the framers of the statute did not intend an absurd result and our construction must avoid such a consequence."). Specifically, the Majority concludes that any corporate contributions for political purposes, unless statutorily excepted, are prohibited under § 16–919(A) and (B), including the contributions made to the Party in this case for operating expenses. *See supra* ¶¶ 31, 39–40. But although the corporations which made the contributions committed crimes, A.R.S. § 16–919(C), the Party did not because they are not listed among the prohibited recipients of such funds, A.R.S. § 16–919(A). Conversely, if the corporations had contributed money for an individual's campaign operating expenses, both the corporations and the recipient would be subject to criminal prosecution. A.R.S. §§ 16–919(A), (C), (D). No reason appears for such anomalous results, and the only logical conclusion is that the legislature solely intended to punish corporations and recipients who, respectively, contribute and receive money or anything of value for the purpose of influencing elections to individual political positions.

¶ 59 Finally, although it is unnecessary to look beyond the language of § 16–919 to discern the meaning of the phrase "influencing an election," I am compelled to address the Majority's contention that A.R.S. § 16–920 sets forth an exclusive list of permitted corporate contributions. *See supra* ¶ 29. Section 16–920(A) provides a list of expenditures that "shall not be construed to be political contributions prohibited by law." The Majority, citing the legal principle that "the expression of one or more items of a class indicates an intent to exclude all items of the same class which are not expressed," *Pima County v. Heinfeld,* 134 Ariz. 133, 134, 654 P.2d 281, 282 (1982), concludes that § 16–920 delineates the class of permissible corporate contributions. *See supra* ¶¶ 29–31. I disagree with this conclusion for two reasons.

¶ 60 First, § 16–920(A) does not purport to establish an exclusive class of permissible corporate contributions. Rather, the provision merely directs that certain expenditures shall not be *construed* as prohibited political contributions. Second, if the legislature had intended by § 16–920 to set forth an exclusive class of permissible corporate contributions, its enactment of § 16–919 to broadly prohibit corporate contributions made for the purpose of influencing an election would be meaningless. *See Herman v. City of Tucson,* 197 Ariz. 430, 434, ¶ 14, 4 P.3d 973, 977 (App.1999) (noting court avoids interpreting statute "so as to render any of its language mere 'surplusage,' [and instead] give meaning to 'each word, phrase, clause, and sentence ... so that no part of the statute will be void, inert, redundant, or trivial.' "). Thus, the legal maxim relied upon by the Majority, which should be applied with great caution, *Lou Grubb Chevrolet v. Indus. Comm'n,* 171 Ariz. 183, 190, 829 P.2d 1229, 1236 (App.1991) (citing *Atkinson, Kier Bros.,*

16. The Majority infers that this point should be ignored because the parties did not raise it. *Supra* ¶ 25. But when considering the proper interpretation and application of statutes, we are not limited to the arguments made by the parties. *Evenstad v. State,* 178 Ariz. 578, 582, 875 P.2d 811, 815 (App.1993). The Majority also notes that § 16–919(B), which prohibits labor organizations from contributing money or anything of value for the purpose of influencing an election, does not list any prohibited recipients of such funds. While this is certainly so, whether the legislature intended to prohibit the recipients listed in subsection (A) from similarly receiving contributions from labor organizations must be left for resolution in a future case. For purposes of this appeal, however, I do not discern, and the Majority does not explain, how the omission in subsection (B) affects the implication derived from the partial listing of prohibited recipients in subsection (A).

*Spicer Co. v. Indus. Comm'n,* 35 Ariz. 48, 274 P. 634 (1929)), is inapplicable.

¶ 61 In sum, I conclude that A.R.S. § 16–919(A) and (B) only prohibit corporate contributions made to influence elections to individual political positions. The parties stipulated that the corporate contributions made to the Party were intended to defray the Party's operating expenses. No facts in the record suggest that the contributions were made for the purpose of influencing an election of an individual to a political position. Likewise, the record does not support a conclusion that the Party impermissibly funneled the contributions to an individual's campaign. I would, therefore, reverse and remand to the trial court with instructions to enter judgment in favor of the Party.